INTERSTATE COMMERCE COMMISSION *v.*
TEXAS ET AL.

No. 85–1222.   Argued December 10, 1986—Decided January 20, 1987*

---

*Together with No. 85–1267, *Missouri-Kansas-Texas Railroad Co.
et al.* v. *Texas et al.*, also on certiorari to the same court.

STEVENS, J., delivered the opinion for a unanimous Court.

*Richard G. Taranto* argued the cause for petitioner in No. 85–1222. With him on the briefs were *Solicitor General Fried, Deputy Solicitor General Cohen, Robert H. Klonoff, Robert S. Burk, Henri F. Rush,* and *H. Glenn Scammel. Michael E. Roper* argued the cause for petitioners in No. 85–1267. With him on the briefs were *Robert B. Batchelder* and *Hugh L. McCulley.* ·

*Fernando Rodriguez,* Assistant Attorney General of Texas, argued the cause for respondents. With him on the brief were *Mary F. Keller,* Executive Assistant Attorney General, *Larry J. Laurent,* Special Assistant Attorney General, and *Douglas Fraser,* Assistant Attorney General.

JUSTICE STEVENS delivered the opinion of the Court.

Trailer-on-flatcar (TOFC or "piggyback") service, a form of mixed train and truck transportation, enables a carrier to transport a trailer and its contents over rail on a flatcar and then to haul the trailer on the highway. The goods need not be unloaded and reloaded when they move from the rail mode to the truck mode; the shipment remains within the trailer or container during the entire journey. Various forms of

TOFC and container-on-flatcar (COFC)[1] service have been offered to the public by railroads, motor carriers, and freight forwarders since the 1930's.[2] These cases concern the extent of the State of Texas' jurisdiction over what is known as "Plan II TOFC/COFC service," which has long been defined as follows:

> "Plan II (All-Rail):
>
> "Door-to-door service performed by the railroad, which moves its own trailers or containers on flatcars under open tariffs usually similar to those of truckers." See *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 397, 403 (1967).

The ICC's statutory authority includes jurisdiction to grant exemptions from regulation as well as to regulate. In 1980, Congress enacted the Staggers Rail Act, 94 Stat. 1895, 49 U. S. C. § 10101 *et seq.*, which authorizes the ICC to exempt from state regulation "transportation that is provided by a rail carrier as a part of a continuous intermodal movement." See § 10505(f). It is undisputed that the ICC may grant an exemption from regulation to interstate TOFC/COFC transportation provided by a rail carrier. The ques-

---

[1] The petitions for certiorari include both TOFC and COFC service. Pet. for Cert. in No. 85–1222, p. I; Pet. for Cert. in No. 85–1267, p. i. A container, unlike a trailer, cannot itself be hauled on the highway by a tractor rig; it must first be placed on a suitable truck trailer. For the purposes of this opinion, however, there are no relevant differences between TOFC and COFC service.

"TOFC service is inherently bimodal in that its basic characteristic is the combination of the inherent advantages of rail and motor transportation: the railroad's ability to provide efficient line-haul transportation of huge volumes of freight for great distances at high speed; and the motor carrier's ability to provide door-to-door, and if necessary job- or farm-site, pickup and delivery." *Ex parte No. 230, Substituted Service-Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service)*, 322 I. C. C. 301, 329 (1964).

[2] See generally *id.*, at 305–309 (describing growth of TOFC service).

tion presented is whether the grant of authority to the ICC under § 10505(f) encompasses the motor freight portion of a Plan II TOFC/COFC shipment entirely within the State of Texas.

I

In 1981, the Commission adopted a regulation exempting Plan II service from state regulation.[3] The regulation unambiguously covers both the motor portion and the rail portion of Plan II service.[4] In a separate case involving interstate Plan II shipments, the Court of Appeals for the Fifth Circuit upheld the regulation, specifically rejecting an argument that the Commission had no authority to exempt the motor portion of the intermodal service. It held that "railowned truck TOFC/COFC service is 'transportation that is provided by a rail carrier.'" *American Trucking Assns., Inc.* v. *ICC*, 656 F. 2d 1115, 1120 (1981).

On September 27, 1982, Missouri-Kansas-Texas Railroad Company, Missouri Pacific Railroad Company, and Southern Pacific Transportation Company (Railroads) petitioned the Railroad Commission of Texas (RCT) to apply the ICC's exemption to their Texas intrastate TOFC/COFC traffic. App. 7–10. The RCT took the position that it retained the authority to regulate the motor carrier segment of intrastate transportation provided by an interstate rail carrier. The Staggers Rail Act provides that a state commission may regulate intrastate transportation provided by a rail carrier, but

---

[3] See 49 CFR § 1039.13 (1986). See also *Improvement of TOFC/COFC Regulation*, 364 I. C. C. 731, aff'd, *American Trucking Assns., Inc.* v. *ICC*, 656 F. 2d 1115 (CA5 1981).

[4] The exemption encompasses "[r]ailroad and truck transportation *provided by a rail carrier* as part of a continuous intermodal movement." 49 CFR § 1039.13 (1986) (emphasis added). In some plans, the motor portion of an intermodal movement is performed by a trucking company, freight forwarder, or shipper. See *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 397, 403 (1967). In such plans, the exemption applies only to the rail portion of the intermodal service.

only to the extent that it conforms with the federal Act and only if the ICC determines that the State's proposed regulatory standards and procedures are consistent with federal standards and procedures.[5] The RCT granted a partial exemption which covered the rail but not the pre-rail and post-ex-rail truck service portions of the intrastate TOFC/COFC service. *Id.*, at 11–12.

The Railroads petitioned the ICC under 49 U. S. C. § 11501(c) to review the RCT's decision and to grant the full TOFC/COFC exemption. The ICC held that the State Commission's assertion of regulatory jurisdiction over "incidental pre-rail and ex-rail over-the-road movements" of Plan II TOFC/COFC service was inconsistent with the federal standards contained in its 1981 regulation.[6] The State of Texas sought review of the ICC's order in the Court of Appeals for the Fifth Circuit. The Railroads intervened as respondents. That court reversed, holding that the truck portion of the intrastate movements at issue was not "transportation . . . provided by a rail carrier" within the meaning of § 10505(f)[7]

---

[5] See 49 U. S. C. § 11501. At the time it issued the decision at issue in this case, the Railroad Commission of Texas had provisional certification to regulate intrastate transportation provided by a rail carrier. The Commission no longer has this statutory authority to regulate intrastate rail rates, classification, rules, and practices of interstate carriers because it was denied certification by the ICC in *Ex parte No. 388 (Sub-No. 31), State Intrastate Rail Rate Authority—Texas*, 1 I. C. C. 2d 26 (1984), aff'd, *Railroad Comm'n of Texas* v. *United States*, 246 U. S. App. D. C. 352, 765 F. 2d 221 (1985).

[6] See ICC No. 39627, Petition Under 49 U. S. C. 11501(c) by Missouri-Kansas-Texas Railroad Company, et al., for Review of an Order of the Railroad Commission of Texas, decided Jan. 19, 1984 (Service Date Jan. 23, 1984); ICC, No. 39704, Petition of Road-Rail Transportation Company, Inc., Under 49 U. S. C. 11501(c) for Review of an Order of the Railroad Commission of Texas, decided Apr. 11, 1984 (Service Date Apr. 13, 1984).

[7] Section 10505(f) provides:

"The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as a part of a continuous intermodal movement."

but rather was "transportation provided by a motor carrier" within the meaning of § 10521(b)(1).[8] *Texas* v. *United States*, 770 F. 2d 452 (1985). The Court of Appeals distinguished *American Trucking Assns., Inc.* v. *ICC, supra,* as limited to TOFC/COFC shipments that at some point in their journey crossed a state boundary. When the service is purely intrastate, the Court of Appeals held, the motor portions of TOFC/COFC service by railroad-owned trucks constitute transportation provided by a motor carrier under § 10521(b)(1) and for that reason are expressly reserved for state regulation. We granted the petitions for certiorari of the ICC and the Railroads, 476 U. S. 1157 (1986). We are persuaded that the Court of Appeals erred.

## II

It is undisputed that the Commission's power to grant these exemptions from state regulation is coextensive with its own authority to regulate, or not to regulate, these intermodal movements by rail carriers.[9] We therefore focus our

---

[8] Section 10521(b)(1) provides:

"(b) This subtitle does not—

"(1) except as provided in sections 10922(c)(2), 10935, and 11501(e) of this title, affect the power of a State to regulate intrastate transportation provided by a motor carrier."

Sections 10922, 10935, and 11501(e) are not relevant to the issue.

[9] The ICC found that the Railroad Commission of Texas' refusal to apply the entire TOFC/COFC exemption violated federal standards and procedures binding upon the State Commission, and authorized the Railroads "to establish any rate, classification, rule, or practice pertaining to intrastate rail or motor transportation provided by a rail carrier as part of a continuous intermodal movement within the State of Texas, to the same extent and in the same manner that they establish rates, classifications, rules, or practices for similar interstate movements." App. to Pet. for Cert. in No. 85–1222, pp. 21a–22a. The Court of Appeals stated:

"The thrust of the argument of the State of Texas is that the I. C. C. lacks jurisdiction over the trucking segment of the totally intrastate TOFC activities of the *intrastate [sic]* rail carriers. Without this jurisdiction,

review on the extent of the Commission's jurisdiction over the trucking segment of intrastate TOFC/COFC activities. Since all of the railroads interested in this proceeding are engaged in interstate commerce, the Commission has authority over the intrastate transportation, as well as the interstate transportation, provided by such carriers.[10]    All of the elements of the Plan II TOFC/COFC service at issue are provided on equipment owned and operated by a rail carrier over which the ICC has jurisdiction.   Thus, the plain language of § 10505(f) unambiguously supports the ICC's position.[11]

It is true, of course, that the text of § 10521(b)(1) can be read to support the contrary result because it is possible to

---

Texas maintains, the I. C. C. could not exempt the intrastate highway transportation from state regulation.   We are constrained to agree." *Texas* v. *United States*, 770 F. 2d 452, 453 (CA5 1985) (emphasis added).

This quotation reveals an incompleteness in the Court of Appeals' reasoning.   If the rail carriers were *"intrastate* rail carriers," the ICC would not have had jurisdiction over either the rail or the motor portion of their intrastate movements.   But this conclusion does not necessarily extend to the rail and motor portions of intrastate movements by all other rail carriers, specifically those that operate across state boundaries.   In fact, the Railroads in this proceeding are all *interstate* rail carriers, and the ICC has consistently exercised jurisdiction over their intrastate, as well as their interstate, movements.   See n. 14, *infra*.   Nevertheless, the Court of Appeals did not err in its underlying conclusion that the ICC's authority to grant an exemption from federal regulation coincides with its authority to grant an exemption from state regulation.   In its argument in this case, the State of Texas also recognizes that the scope of the ICC's authority over exemptions from state regulation is coextensive with its own jurisdiction either *to impose federal regulation or to grant an exemption from* federal regulation.   Thus, although this case involves the ICC's effort to grant exemptions from regulation, the same legal question would be presented if the ICC were trying to regulate the rates for an interstate rail carrier's intrastate movements, and the carrier asserted that only the state commission had such power.

[10] See 49 U. S. C. §§ 10501 and 11501.   The Commission does not assert *jurisdiction over wholly intrastate carriers; nor does it assert the authority to exempt such carriers from state regulation.*

[11] See n. 7, *supra*.

regard the rail carrier as a "motor carrier" during the truck portion of the intermodal movement. We believe, however, that the correct, and certainly the more natural, reading of the statute is that all of the TOFC/COFC service provided by interstate rail carriers on equipment which they own is "transportation provided by a rail carrier" subject to the jurisdiction of the ICC.[12]

The position urged by respondents encounters three serious difficulties. First, it is inconsistent with the agency's historical treatment of Plan II TOFC/COFC service as "provided by a railroad." In *Ex parte 230, Substituted Service-Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback Service)*, 322 I. C. C. 301, 304–305, 309–312 (1964), the Commission stated:

> "Under plan II, the railroad holds out to provide a complete door-to-door service under a single bill of lading. Neither the shipper nor the consignee intervenes in any way in the overall transportation activities or does anything beyond tendering the shipment to the railroad at origin or at the shipper's loading dock." *Id.*, at 311.

The Commission recognized that the distinctive element of Plan II service was not the use of trailers or containers to offer door-to-door pickup and delivery service via rail and

---

[12] Our holding that the ICC's jurisdiction under § 10505(f) includes the intrastate portions of Plan II TOFC/COFC service applies whether or not a State has been certified under 49 U. S. C. § 11501. Because the Railroad Commission of Texas is not now certified to regulate railroads, the statute independently places the truck portion of intra-Texas TOFC/COFC service within the jurisdiction of the ICC:

"Any intrastate transportation provided by a rail carrier in a State which may not exercise jurisdiction over an intrastate rate, classification, rule, or practice of that carrier due to a denial of certification under this subsection shall be deemed to be transportation subject to the jurisdiction of the Commission under [§ 10501 *et seq.*]." 49 U. S. C. § 11501(b)(4)(B).

highway, but rather the identity of the carrier offering this service:

> "[A]ll three—rail carrier, motor carrier, and freight forwarder—are even today providing, through the use of piggyback, services which in physical characteristics are substantially similar. Any one of the three can offer a transportation service which includes door-to-door pickup and delivery, movement of loaded trailers between a shipper's premises and a rail yard, and line-haul transportation of the loaded trailers by rail. The railroad does this under its plan II TOFC tariff; the trucker does it under plan I, in which it is encouraged by the railroads . . . and the freight forwarder does it through use of plans III and IV rail tariffs." *Id.*, at 330.

In none of the plans was a rail carrier treated either as a hybrid, or as a motor carrier, during the truck segment of the intermodal movement. Presumably, in enacting § 10505, Congress was aware of the Commission's consistent practice of regulating railroads as "rail carriers" even when they performed Plan II intermodal service.

Second, the State's interpretation of § 10521(b)(1) would make that section authorize state regulation of TOFC/COFC services in areas where it has already been rejected. The term "intrastate transportation provided by a motor carrier" must refer either to the intrastate motor portion of any TOFC/COFC movement or to the entire intrastate movement when a portion of it is performed by truck service. If the term refers only to the motor portion, the State's reading of the statute would preserve the State's power to regulate the intrastate motor portion of an interstate Plan II TOFC/ COFC shipment. But Texas acknowledges that it has no such power.[13] Alternatively, if the term refers to every in-

---

[13] And of course the Fifth Circuit so held in *American Trucking Assns., Inc.* v. *ICC*, 656 F. 2d 1115 (1981). The reason why Texas does not have that power is that the statute plainly authorized the ICC either to regulate, or to exempt from regulation, such continuous interstate movements. We think it clear that the ICC's authority over intrastate rail transportation

trastate shipment that includes a motor segment, the railroad must be regarded as a "motor carrier" even during the rail portion of the intermodal movement, and the RCT would retain the power to regulate the entire intrastate movement. Again, Texas does not claim that authority. We think it clear that the only way to square the words of the statute with those aspects of the ICC's jurisdiction that the State does accept is to hold that the ICC's authority over intrastate transportation provided by an interstate rail carrier encompasses the entire movement, even when it includes a truck segment under Plan II.[14]

Third, the special statutory authority of the Commission to determine the proper interrelationship of different modes

---

by an interstate rail carrier encompasses the entire movement, even when it includes a truck segment. This conclusion was at least implicit in the Fifth Circuit's opinion in *American Trucking Assns., Inc.* v. *ICC, supra,* at 1120:

"[R]ail-owned truck TOFC/COFC service is 'transportation that is provided by a rail carrier.' Had Congress intended to limit the Commission's exemption authority to rail transportation, it could easily have done so by using that language. Instead, it chose the broad 'transportation-that-is-provided-by-a-rail-carrier' language and presumably did so with knowledge that it previously had defined 'transportation' to include the movement of passengers or property by motor vehicle." (Citations omitted; footnotes omitted.)

[14] The Court of Appeals based its conclusion that "transportation provided by a rail carrier" should be defined more narrowly for intrastate traffic than for interstate commerce on the "potential mischief" of exempting intrastate rail travel from regulation. The Court of Appeals focused on the hypothetical example of a small intrastate rail carrier that provides minimal rail service within a city and extensive truck service to convey goods to and from the city, and is exempt from state regulation. See 770 F. 2d, at 454–455. This scenario could only occur, however, if the ICC had authority to exempt such transportation from regulation. But because the hypothetical railroad is only an *intrastate* carrier, the ICC would not have any jurisdiction over it, and the speculative potential for mischief would not exist. In this case, by contrast, the Railroads are interstate carriers whose TOFC/COFC services include some segments entirely within Texas. See Guide to Piggyback Routes, Distribution 190, 196 (July 1982) (route diagrams for TOFC/COFC service). See also n. 9, *supra.*

of transportation supports its interpretation of the Staggers Rail Act.[15] The statute was a response to the concern that differing state and federal standards applying to the industry and excessive governmental regulation by both federal and state authorities had contributed to the financial difficulties of major railroads.[16] In its statement of rail transportation policy, Congress unambiguously expressed its interest in allowing free competition, to the maximum extent possible, to govern the financial health of the railroad industry.[17] The importance of that policy is confirmed by the fact that the

[15] "[W]e cannot accept arguments based upon arguable inference from nonspecific statutory language, limiting the Commission's power to adopt rules which, essentially, reflect its judgment in light of current facts as to the proper interrelationship of several modes of transportation with respect to an important new development." *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S., at 410. The reading of the Act proposed by respondents impermissibly limits the ICC's power to implement national transportation policy in the evolving area of intermodal transportation.

[16] See H. R. Rep. No. 96–1035, pp. 38, 61, 128–130 (1980); H. R. Conf. Rep. No. 96–1430, p. 79 (1980).

[17] Section 10101a "establishes a specific rail transportation policy to guide the Commission in its duties in regulation of the railroad industry." H. R. Conf. Rep. No. 96–1430, *supra*, at 80. Section 10101a provides, in part:

"10101a. Rail transportation policy

"In regulating the railroad industry, it is the policy of the United States Government —

"(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

.        .        .        .        .

"(4) to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

"(5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;

.        .        .        .        .

"(7) to reduce regulatory barriers to entry into and exit from the industry."

statement of general transportation policy applicable to all types of carriers, which generally prescribes the impartial regulation of all competing modes of transportation, is introduced by an exception providing that the special policy statement endorsing competition in railroad transportation shall prevail when transportation policy has an impact on rail carriers.[18]   Even if the question of the extent to which § 10521(b)(1) restricts the Commission's power under § 10505 in these cases were in doubt, the statutory statement of policy priorities would lead us to agree with the ICC's view that the ambiguity should be resolved in favor of competition, rather than partial state regulation of Plan II TOFC/COFC service.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[18] Section 10101 provides in part:

"(a)  Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation . . . ."