**G. & T. TERMINAL PACKAGING CO., INC. and Anthony Spinale, Appellants,**

v.

**CONSOLIDATED RAIL CORPORATION.**

No. 86–5897.

United States Court of Appeals, Third Circuit.

Argued June 22, 1987.

Decided Sept. 23, 1987.

Rehearing and Rehearing In Banc Denied Oct. 22, 1987.

David J. Golberg (argued), Warren, Goldberg, Berman & Lutitz, P.A., Princeton, N.J., for G. & T. Terminal Packaging Co., Inc. and Anthony Spinale.

Laurence Z. Shiekman (argued), Deborah F. Cohen, Jonathan M. Broder, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Paul A. Cunningham, Richard B. Herzog, Russell M. Blau, Pepper, Hamilton & Scheetz, Washington, D.C., for Consolidated Rail Corp.; Bruce B. Wilson, Constance L. Abrams, Consolidated Rail Corp., Philadelphia, Pa., of counsel.

David H. Baker, Dickson R. Loos, Holland & Knight, Washington, D.C., amicus curiae United Fresh Fruit & Vegetable Ass'n, Inc.

J. Thomas Tidd, Kenneth P. Kolson, Association of American Railroads, Washington, D.C., amicus curiae Association of American Railroads.

Daniel J. Sweeney, McCarthy, Sweeney & Harkaway, P.C., Washington, D.C., William J. Hanlon, Morristown, N.J., amici National Small Shipments Traffic Conference, Inc. and Drug and Toilet Preparation Traffic Conference, Inc.

Before GIBBONS, Chief Judge, and WEIS and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

Several rail shippers[1] of agricultural commodities appeal from a summary judgment in favor of Consolidated Rail Corp. (Conrail) in their action to set aside rates fixed by Conrail for their shipments. The shippers' appeal poses the question whether the Congressional decisions in the Railroad Revitalization and Regulatory Reform Act of 1976 (4 R Act), Pub.L. No. 94–210, 90 Stat. 31, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, in favor of deregulation of most rail tariffs should be deemed to have overruled the holding in *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) that courts may not entertain common law challenges to rates established pursuant to the Interstate Commerce Act. 49 U.S.C. §§ 10101–11917. The district court held that the *Abilene Cotton Oil* rule survives the 4 R Act and the Staggers Rail Act. We affirm.

### I.

On April 10, 1980 rates for rail transportation of potatoes and other agricultural

---

1. The shippers are G & T Terminal Packaging Co., Inc., Mr. Sprout, Inc., Tray Wrap, Inc., and Anthony Spinale. The shippers are located at Hunts Point Market or Kingsbridge, Bronx, New York. They purchase for resale potatoes or brussel sprouts grown in the western United States.

commodities were exempted from regulation under the Interstate Commerce Act. *Ex Parte No. 436 (Sub No. 2), Rail General Exemption Authority—Miscellaneous Commodities* (filed March 24, 1980), 45 Fed.Reg. 204 (1980). The plaintiff shippers are served by Conrail, which delivers to them at Hunts Point or Kingsbridge rail car shipments of potatoes and other commodities received from western connecting carriers. Apparently because the plaintiff shippers filed numerous claims against Conrail for loss or damage, Conrail informed all western connecting carriers in May or June of 1983 that it was imposing a surcharge of $500 or $600 per car (depending on the point of origin) on all rail car shipments to them. A Conrail internal memorandum noted that one of the plaintiff shippers had filed claims for amounts exceeding Conrail's revenues. Faced with the surcharges of $500 or $600 per car, the shippers on September 30, 1983 wrote a letter to the Chairman of the Interstate Commerce Commission, contending that the rates were discriminatory and unreasonable and inquiring whether the Commission retained any jurisdiction over them. Herbert Hardy, Director of the Office of Proceedings, directed by ICC Chairman Taylor, responded:

> The Interstate Commerce Commission no longer exercises jurisdiction over the rates charged by the railroads for the movement of the commodities covered by the exemption or over the practices engaged in by the railroads in the course of transporting them. Because your client and its affiliates appear to deal only in products covered by the agricultural commodities exemption, any dispute they may have with Conrail, or other railroads would have to be settled in the courts rather than before the Commission.

After receiving Mr. Hardy's letter, the shippers filed in the district court a seven count complaint alleging that the new rates violated the Interstate Commerce Act, 49 U.S.C. §§ 10101–11917, the common law, the antitrust laws, and the United States Constitution. In essence the common law claims assert that the decision by Conrail to impose a surcharge on shipments to the plaintiff shippers was made in retaliation for the shippers pursuing valid claims for past damages and delays, and discriminated against them in comparison with shippers similarly situated. The district judge to whom the case was first assigned granted Conrail's motion for summary judgment on the Interstate Commerce Act and constitutional claims. The antitrust claims were later dismissed with prejudice by stipulation. Conrail's motion for summary judgment on the shippers' common law claims was initially denied.

In September, 1985, Conrail filed a petition with the Interstate Commerce Commission, pursuant to 49 U.S.C. § 11701, requesting the commencement of a declaratory order proceeding to the effect that the commission retained jurisdiction over rates exempted pursuant to 49 U.S.C. § 10505, and that such jurisdiction was exclusive. On March 5, 1986 the Commission, responding to the Conrail petition, stated that, despite Mr. Hardy's letter,[2] it retained jurisdiction over exempted rates and that such unexercised jurisdiction preempted common law causes of action challenging such rates. *Consolidated Rail Corporation—Declaratory Order—Exemption*, 1 ICC 2d 895 (Feb. 27, 1987).

Armed with the Commissioner's ruling, and with the intervening decision in *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd. of Mississippi*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986), Conrail renewed its motion for summary judgment.

In *Transcontinental* the Supreme Court considered whether the states could impose conditions on the first sale of natural gas which, by direct statutory exemption, was placed beyond regulation by the Federal Energy Regulatory Commission (FERC). Prior to 1978 regulation by FERC preempted any state regulation. *See Northern*

---

2. The Commission explained that Mr. Hardy's informal letter response was not binding on the agency. Consolidated Rail Corporation Declar-

atory Order Exemption, 1 ICC 2d 895 (Feb. 27, 1986).

*Natural Gas Co. v. State Corporation Comm'n of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963). In the Natural Gas Policy Act of 1978, Pub.L. 95–621, 92 Stat. 3351, Congress substantially restricted FERC's regulatory authority. The *Transcontinental* Court noted that a "decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much preemptive force as a decision *to* regulate." 106 S.Ct. at 717 (citations omitted). The Court refused to accept the argument that Congress "in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the States the power it had denied FERC." *Id.*

A second district judge to whom the renewed Conrail motion for summary judgment was assigned, found both the Commission's declaratory ruling and the *Transcontinental* Court's reasoning to be persuasive and granted summary judgment. The order granting summary judgment on the shipper's common law claims resulted in an appealable order because it disposed of all the remaining claims. *See* Fed.R. Civ.P. 54(b). This appeal followed. Since summary judgment was entered on all claims not voluntarily dismissed, our review is plenary.

## II.

The shippers contend that the court erred in dismissing their statutory claims, in holding their common law claims to be preempted, and in dismissing their constitutional law claims. We address these contentions in that order.

### A.

■ The shippers point out that under the Interstate Commerce Act a holder of a receipt or bill of lading is entitled to recover for the actual loss or injury to the property caused by the carrier. 49 U.S.C. § 11707(a)(1), (c)(1). They urge, as well, that this carrier's responsibility for loss or damage survives deregulation. *See First*

*Pennsylvania Bank v. Eastern Airlines, Inc.,* 731 F.2d 1113 (3d Cir.1984). From these unquestionably sound premises the shippers urge the conclusion that an attempt to increase rates in an amount sufficient to cover the cost of processing, defending, and paying damage claims must be illegal. This conclusion, however, does not follow from the premises. The summary judgment record establishes that some of the plaintiff shippers have filed and are litigating loss or damage claims against Conrail, pursuant to 49 U.S.C. § 11707, in appropriate state courts. Recovery in those pending actions, or in any subsequently filed, will not be affected by the tariffs here challenged. The shippers' statutory argument would be equally applicable to rates fixed by the Commission prior to deregulation, or to rates fixed under the 4 R Act and Staggers Rail Act for dominant non-exempt traffic. Yet the shippers cite no authority—statutory, regulatory, or judicial—for the proposition that carrier liability under section 11707 is not a cost which may be taken into account in fixing rates. The absence of such authority suggests the obvious: section 11707 prohibits rail carriers from relieving themselves of the cost of paying loss or damage claims; it simply does not deal with what costs may be taken in account in determining rates. Indeed the 4 R Act, as amended by the Staggers Act, states specifically that "[n]othing in this subsection or section 11707 ... shall ... give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707...." 49 U.S.C. § 10505(e). Under the 4 R Act and the Staggers Act, levels or rates of service are to be determined primarily by competition in the marketplace for transportation services. Thus we agree with the district judges, both of whom rejected the claim that the challenged rates violated any relevant federal statute.

### B.

■ On the motion for summary judgment we are obliged to accept as true the shippers' contention that the surcharges

imposed on their shipments resulted in tariffs higher than those being charged to some of their competitors. We also accept, arguendo, their legal contention that at common law there were remedies against common carriers for discrimination in rates among shippers. After the enactment of the Interstate Commerce Act, however, rail shippers were no longer subject to such remedies. *See Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) (no common law actions challenging rates established under the Interstate Commerce Act). *See also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (state common law remedy imposing service requirements preempted by Interstate Commerce Act). From the time *Abilene Cotton Oil* was decided to date, no case has permitted a shipper to challenge a freight rate in a common law action. The shippers, however, discern in the deregulation scheme of the 4 R Act and Staggers Act a Congressional intention to restore the common law authority of the state or federal courts, at least in cases in which the Commission has found commodities to be exempt.

Prior to 1976, railroads were required to file tariffs with the Commission and interested parties were able to challenge these rates. 49 U.S.C.A. §§ 1(5), 15 (1959) (amended 1976, repealed 1980). The authority of the Commission to exempt rates from challenge has its roots in the 4 R Act, which had a declared purpose of "permit[ting] railroads greater freedom to raise or lower rates for rail services in competitive markets." 45 U.S.C. § 801(b)(3) (1982). The exemption authority was a principal component of the Staggers Act, which furthered the policy of "allow[ing], to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101a(1) (1982). But while both the 4 R Act and Staggers Act decreased the Commission's role with respect to rate-making, neither their text nor their legislative history suggests a Congressional intention to resurrect common law remedies moribund

since 1907. Indeed the Staggers Act expressly codified the holding of *Abilene Cotton Oil*, adding to the Interstate Commerce Act the provision:

> The jurisdiction of the Commission ... over transportation by rail carriers, and the remedies provided in this title with respect to the rates, classifications, rules, and practice of such carriers, is exclusive.

49 U.S.C. § 10501(d) (1982). While this provision could be literally interpreted to mean that it is jurisdiction over provided remedies—and not the remedies themselves—which are exclusive, the legislative history belies such an interpretation:

> The remedies available against rail carriers with respect to rail rates, classifications, rules and practices are exclusively those provided by the Interstate Commerce Act, as amended, and any other federal statutes which are not inconsistent with the Interstate Commerce Act. No state law or federal or state common law remedies are available.

H.R.Conf.Rep. No. 96–1430, 96th Cong., 2d Sess. 106, *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4110, 4138.

Since this statutory provision, as illuminated by legislative history, makes clear that the only remedies regarding rail rates are those provided by federal statutes, the savings clause, 49 U.S.C. § 10103 (1982), has no application to this case. The savings clause only states that "[e]xcept as otherwise provided in this subtitle," common law remedies are cumulative. The explicit legislative intent that only federal statutory remedies exist is precisely the type of exception contemplated by the savings provision.

The shippers would have us apply the expressly preemptive provision in 49 U.S.C. § 10501(d) only in cases in which the Commission fixed rates, and not in cases where it exercised its exemption authority. The only possible textual support for such an interpretation of the section is the literal reading rejected above.

Moreover, an interpretation which viewed exempted rates as removed from

the jurisdiction of the Commission would be inconsistent with the statutory scheme, which provides for the Commission's ongoing jurisdiction over exempt traffic. 49 U.S.C. § 10505(d) permits revocation by the Commission of exemption where necessary to carry out the transportation policy of the Act. Congress determined that "there be continuing evaluation of the appropriateness of regulation and continuing deregulation where consistent with the Act's policies." *Coal Exporters Ass'n of the United States, Inc. v. United States,* 745 F.2d 76, 82 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985). The exemption regulations provide that "[n]othing in this exemption shall be construed to affect our jurisdiction under section 10505 or our ability to enforce this decision...." 49 C.F.R. § 1039.10 (1986).

The ongoing jurisdiction to reconsider the exemption in light of competitive conditions is conferred in the first instance on the Commission, not on the courts. Recognition of a common law remedy with respect to rates would have the effect of substituting a court's regulation for the Commission's decision in favor of deregulation. In the 4 R Act and Staggers Act, Congress has decided in favor of permitting railroads to fix their own rates, subject only to the regulation imposed by the competitive market, except in cases where in the judgment of the Commission, competitive forces do not operate effectively. Until the Commission determines in a section 10501(d) proceeding that Conrail is dominant over the plaintiff shippers' traffic in agricultural products this court cannot grant relief to the shippers. *See Bessemer and Lake Erie R.R. Co. v. ICC,* 691 F.2d 1104 (3d Cir.1982), *cert denied sub nom., Western Coal Traffic League v. United*

*States,* 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). As the Commission noted in the *Conrail Exemption Decision:*

> If another body were allowed to replace the regulatory restrictions dismantled at the Commission, the agency's exemptive actions would be nugatory. Worse, the potential for variation and conflict among various decisionmakers could make the post-exemption regime more restrictive of rail carriers than the one suspended by exemption.

*Consolidated Rail Corporation—Declaratory Order—Exemption,* 1 ICC 2d 895 (Feb. 27, 1987).

The Commission's analysis is consistent with that of the Supreme Court in the quite analogous context of deregulation of the natural gas industry. *Transcontinental Gas Pipeline Corp. v. State Oil & Gas Board,* 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986).[3] It is, moreover, consistent with that of other courts which have addressed the issue. *See Alliance Shippers, Inc. v. Southern Pacific Transp. Co.,* 673 F.Supp. 1005 (C.D.Cal. 1986); *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R.,* No. 84–1267 (N.D. Ohio Sept. 25, 1986). Thus we agree with the district court that the shippers' common law claims, whether considered as arising under state or federal common law, are preempted. *Abilene Cotton Oil* is still the controlling rule.

Judge Aldisert is concerned that our reading of the statute leave the shippers without a remedy for price discrimination. This argument ignores that the Commission, in granting the exemption, has determined that regulation is "not needed to protect shippers from abuse of market power." 49 U.S.C. § 10505(a)(2)(B).[4] The

---

**3.** *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), on which the shippers rely, is not helpful to them. In that case, the tort remedy could be utilized without intruding upon any judgment of the regulatory agency. Here, recognition of a tort remedy for discriminatory rates would involve case-by-case judicial regulation of rates in the face of a decision by a regulatory agency, acting pursuant to Congressional directives, that the market is sufficiently competitive that no regulation of rates is necessary. Surely it cannot be said

here, as it was in *Nader,* that "any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability would be merely incidental." 426 U.S. at 300, 96 S.Ct. at 1985.

**4.** The alternative basis for an exemption, where the Commission determines that the transaction or service is of limited scope, 49 U.S.C. § 10505(a)(2)(A), is not involved in this case.

shippers' remedy for price discrimination is simple: it can choose to use other means of transportation. Congress and the Commission have determined that the market is adequate protection; it is not the place of this court to disagree with that determination. Even if the shippers could show that Congress and/or the Commission were wrong, this would not permit us to allow damages. Thus, while it may be that the Commission would not award damages for discriminatory prices charged during a period of exemption, an issue not decided here, we do not agree that this possibility requires a different result.

### C.

■ The shippers' constitutional law claim is that by imposing discriminatory tariffs on their traffic, Conrail deprived them of property and liberty interests without due process of law. The first district judge to whom the case was assigned dismissed this claim on the theory that common law remedies were preserved by the Staggers Rail Act, and thus that there was a remedy, satisfying due process for any deprivation which may have occurred. Conrail contends that the shippers consented to this dismissal, and thus cannot now appeal it. The record, however, is sufficiently ambiguous with respect to any such consent that we deem it appropriate to address the merit of the contention.

Every court that has considered the matter has concluded that Conrail is not a governmental actor for purposes of constitutional analysis. *See Morin v. Consolidated Rail Corp.*, 810 F.2d 720 (7th Cir. 1987); *Myron v. Consolidated Rail Corp.*, 752 F.2d 50 (2d Cir.1985); *Wenzer v. Consolidated Rail Corp.*, 464 F.Supp. 643 (E.D.Pa.), *aff'd* 612 F.2d 576 (3d Cir.1979). While Conrail is subject to extensive government regulation, such regulation does not convert its conduct into governmental action for constitutional purposes. *See Rendall-Baker v. Kohn*, 457 U.S. 830, 841–42, 102 S.Ct. 2764, 2771–72, 73 L.Ed.2d 418 (1982). Thus we join those courts that have held expressly that Conrail is a private actor.

### III.

The shippers' statutory, common law, and constitutional arguments all lack merit. The summary judgment appealed from will therefore be affirmed.

ALDISERT, Circuit Judge, dissenting.

What divides this court is a straightforward disagreement. We are not fencing with glancing blows. Our divergent views meet a single controlling issue head on: Does federal law preempt state common law claims against rail carriers for discriminatory conduct practiced during the period in which the Interstate Commerce Commission, pursuant to the Staggers Rail Act of 1980, has exempted relevant rail traffic from regulation? The majority says common law remedies are preempted in these circumstances. I say they are not. Accordingly, I dissent and would reverse the judgment of the district court.

### I.

I begin by stating certain universal precepts that govern this case. To decide a federal preemption issue is to determine Congressional intent. *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, ——, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In the context of federal regulation of rail carriers, repeals of common law remedies by implication are not favored: a statute will not be construed as taking away a common law right unless the right is so repugnant that it renders the statute's provisions nugatory. *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553 (1907). These precepts strongly influence my approach to this case. Therefore, I begin with an examination of Congressional intent.

### II.

Congress enacted the Staggers Act of 1980, Pub.L. No. 96–448, 94 Stat. 1898, to dismantle the regulatory scheme estab-

lished by the Interstate Commerce Act of 1887 (ICA). Influenced by nearly 100 years of railroad experience, Congress came to the conclusion that "[m]odernization of economic regulation of railroads, with greater reliance on the marketplace, is essential to achieve maximum utilization of railroads, to save energy and to combat inflation." H.Conf.Rep. No. 1430, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Admin.News 4110, 4111. In overhauling the federal regulatory scheme, Congress desired "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C. § 10101(a); *see ICC v. Texas*, — U.S. —, —, 107 S.Ct. 787, 793, 93 L.Ed.2d 809 (1987); *Consolidated Rail Corp. v. United States*, 812 F.2d 1444, 1449 (3d Cir.1987).

In choosing to allow competition to play an important role in establishing rail rates, Congress granted the ICC authority to exempt from regulation categories of rail transportation when the Commission concluded that such regulation was not necessary to carry out the transportation policy as expressed in section 10101a. *See* 49 U.S.C. § 10505. To "ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rules, practices, etc.," the Act "preempt[ed] state authority over rail rates, classifications, rules and practices." H.Conf.Rep. No. 1430, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 4138.

Congress, however, also expressed the desire "to prohibit unlawful discrimination." 49 U.S.C. § 10101a(13). With respect to the existence of common law claims, Congress amended 49 U.S.C. § 10103 to state:

> Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law.

Thus, two conclusions are inescapable: where there is no federal regulation of rates because of the promulgation of exemptions, (1) no state may fill the void by imposing regulation of its own; and (2)

common law remedies are available *inter alia* to prohibit unlawful discrimination.

## A.

It cannot be denied that prior to the enactment of the ICA and ICC, several states recognized a common law action on behalf of a shipper against a railroad for discriminatory conduct practiced by the carrier. In *Messenger v. Pennsylvania R.R. Co.*, 37 N.J.L. 531 (1874), the New Jersey Court of Errors and Appeals determined that railroads by virtue of their common carrier status are bound to use their franchise with fairness and for the common good. "A common carrier owes an equal duty to all and it cannot be discharged if he is allowed to make unequal preferences, and thereby prevent or impair the enjoyment of the common right...." *Id.* at 535. The court noted that a railroad contract that gave to certain persons an exclusive advantage over all other transporters in the transportation of goods was unjust and could not be legally enforced. "For a like service, the public are entitled to a like price." *Id.* at 536.

In *McDuffee v. Portland and Rochester R.R.*, 52 N.H. 430 (1873), the Supreme Judicial Court of New Hampshire recognized that a rail carrier's service is a common as well as a public right, belonging to every individual as well as to the state. The court then stated:

> the commonness of the right necessarily implies an equality of right, in the sense of freedom from unreasonable discrimination; and any practical invasion of the common right by an unreasonable discrimination practiced by a carrier held to the common service, is insubordination and mutiny, for which he is liable, to the extent of the damage inflicted, in an action of case at common law.

*Id.* at 450; *see also* 2 J. Kent, *Commentaries on American Law* 983 (Holmes ed. 1896) ("Even at common law a carrier is bound to make only reasonable charges, and perhaps there is a further obligation not to charge two persons differently for exactly the same service."). The common law right of the shipper to be free from

unjust discrimination at the hands of a rail carrier has roots in English law. In *London & N.W. Ry. Co. v. Evershed*, 3 App. Cas. 1029, 1035 (House of Lords 1878), Lord Chancellor Cairns stated that "[t]he one right, to my mind, the clear and undoubted right, of a public trader is to see that he is receiving from a railway company equal treatment with other traders of the same kind doing the same business and supplying the same traffic." It bears emphasis that these cases and holdings were decided in an era that preceded the imposition of federal railroad regulation.

## B.

Our inquiry, then, must follow a very narrow compass: if common law remedies were preempted when and because the ICC assumed regulation of the railroad industry, are they still preempted when the ICC abdicates its regulation by promulgating an exemption? To ask this question is also to answer it, yet the answer seems best expressed by Karl Llewellyn:

> [T]he rule follows where its reason leads; where the reason stops, there stops the rule.

K. Llewellyn, *The Bramble Bush* 157–58 (1960). The reason for the rule of federal preemption was the interposition of federal regulation. When that regulation disappears, the reason for preemption must fall with it. I think Congress intended precisely that. Both the language and scheme of the Staggers Act compel this conclusion.

## III.

Regulated rail carriers subject to the jurisdiction of the ICC are generally prohibited from unreasonably discriminating between shippers when providing substantially the same service. *See* 49 U.S.C. § 10741. An aggrieved shipper may seek relief from unreasonable discrimination by filing a complaint with the Commission pursuant to 49 U.S.C. § 11701. When the ICC exempts a field of rail transportation from regulation, however, the prohibitions of section 10741 do not apply to deregulated carriers because their traffic is no longer subject to the jurisdiction of the ICC. *See* 49 U.S.C.

§ 10741. Yet, in light of Congress' policy "to prohibit unlawful discrimination," 49 U.S.C. § 10101a(13), it seems to me that Congress did not intend to leave shippers without a remedy for discriminatory conduct practiced by rail carriers exempted from regulation. A common law action would provide such a remedy. And Congress expressly anticipated this under the savings clause of the Staggers Act, 49 U.S.C. § 10103.

## IV.

A remedy is a procedure that gives to one who has been hurt, by another's violation of an obligation imposed by contract or by law, a right to seek actual or substituted redress. A remedy does not guarantee redress, but does guarantee the opportunity to seek it. Conrail's interpretation of the Staggers Act falls woefully short of providing a shipper with a remedy. Under the most generous view of Conrail's argument, the shipper never has an absolute right to be heard on the merits. At the very least, the shipper is only given the right to petition the ICC to withdraw its exemption and restore regulation of the entire railroad industry's transportation of potatoes. A proceeding to restore regulation of the entire railroad industry is not the mirror image of a proceeding to prove discrimination against a particular potato shipper by a particular carrier. The jargon of produce is especially apt here: you cannot compare the apples of an application to impose industry-wide regulation with the oranges of a claim by one shipper against one railroad for one product.

Thus, the possibility that the ICC, under 49 U.S.C. § 10505(d), may revoke a previously-issued exemption and reimpose regulation does not, as Conrail contends, guarantee an "after the fact" remedy to address the accused discrimination here. In petitioning the ICC to revoke an applicable exemption, the shipper would first have to overcome the slated Congressional goals "to minimize the need for Federal regulatory control over the rail transportation system" and "to promote a safe and efficient rail transportation system." 49 U.S.C.

§ 10101a(2), (3). Although Staggers invests the ICC with discretion to restore regulatory control, the proceedings before the Commission would not take place in a judicially-neutral ambience; the petitioner would have the very high burden of overcoming the legislatively-declared public policy of minimal Federal regulatory control. Should the ICC follow its previous decision respecting and reflecting that Congressional policy, the shipper would never have a right to be heard anywhere on its charge of discrimination. I do not think Congress intended such a draconian denial of a remedy, especially under a statute that specifically provides for "remedies ... at common law." 49 U.S.C. § 10103.

But let us assume the best case scenario under Conrail's theory of an exclusive statutory remedy. That best case would not afford complete redress to the shipper. Even if the exemption were revoked and new regulatory controls were instituted *in futuro,* there is no apparent vehicle to provide retroactive relief, a relief that seems mandatory here if primitive notions of justice are to be served. The ICC would have no power to award damages for discriminatory rates charged by rail carriers during the interim exemption period, because the prohibitions of section 10741 do not apply to carriers not subject to the jurisdiction of the ICC. This is the black hole in Conrail's theory. I simply cannot believe that Congress intended to deny such relief to victims of discrimination.

I do not accept a statutory construction that dictates that shippers, like G & T, are denied an adequate remedy for a carrier's unfair conduct during an exemption period, or an interpretation that would require shippers to seek alternate and obviously more expensive means of shipping, such as motor or air freight. When it is considered that shippers could be damaged irreparably or forced to dissolve their businesses because of this lack of a remedy, it becomes obvious that Congress intended no such outrage. Conrail's "after the fact" remedy is in truth no remedy.

I think that the statute means only this: as long as shippers have access to the ICC to seek redress under section 10741 for a carrier's discriminatory conduct because either the ICC still regulates the rail transportation involved or has abrogated an applicable exemption, the shipper has no common law remedy; the shipper must go to the ICC and not the courts. But where, as here, the Commission has surrendered its jurisdiction over a field of rail transportation by granting an exemption pursuant to the Staggers Act, a common law remedy exists under the savings clause of the Act to remedy unlawful discrimination practiced by rail carriers during the exemption period. *See First Pa. Bank v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1120 (3d Cir. 1984) (deregulation stripping the Civil Aeronautics Board of its powers left the courts "free to proceed without circuity to apply directly the familiar federal common law rules relating to the subject matter of released value rates"). Although I believe the foregoing is sufficient to justify the reversal of the district court's judgment, I nevertheless will address other arguments presented to us.

## V.

Conrail's argument that the teaching of *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), precludes recourse to common law is a contention that warrants analysis. The centerpiece of this allegation is that the presence of a common law remedy would conflict with the federal regulatory scheme, creating a lack of uniformity from state to state. *See Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.,* 474 U.S. 409, 423, 106 S.Ct. 709, 717, 88 L.Ed.2d 732 (1986) (preemption analysis should consider whether state regulation would disrupt the federal regulatory scheme); *Louisiana Pub. Serv. Comm'n,* 476 U.S. at ——, 106 S.Ct. at 1899 (preemption occurs when there is an outright or actual conflict between federal and state law). I have two responses to Conrail's argument.

First, a common law remedy for a deregulated rail carrier's discriminatory conduct will not conflict with the ICC's authority

under 49 U.S.C. § 10741 to proscribe such conduct—or with the Commission's power under 49 U.S.C. § 10701a to determine the reasonableness of a rate charged by a carrier—because the common law remedy will exist only when an ICC exemption for the relevant traffic remains in effect. In *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), the Court permitted plaintiff's common law claims against an air carrier to go forward without requiring the plaintiff to first present them to the Civil Aeronautics Board for determination. In noting that there was no irreconcilable conflict between the relevant Act's regulatory scheme and the common law remedy, the Court distinguished *Abilene* in language notably applicable to the present case:

> In *Abilene* the carrier, if subject to both agency and court sanctions, would be put in an untenable position when the agency and a court disagreed on the reasonableness of a rate. The carrier could not abide by the rate filed with the Commission, as required by statute, and also comply with a court's determination that the rate was excessive. The conflict between the court's common-law authority and the agency's ratemaking power was direct and unambiguous. *The court in the present case, in contrast, is not called upon to substitute its judgment for the agency's* on the reasonableness of a rate—or, indeed, *on the reasonableness of any carrier practice.*

*Id.* at 299–300, 96 S.Ct. at 1984–85 (emphasis supplied).

Similarly, there is no irreconcilable conflict between a common law remedy here and the ICC's jurisdiction as provided by Congress. Because the common law action is available only when the ICC surrenders its jurisdiction over the relevant traffic by granting an exemption, the courts will not substitute their judgment for that of the agency's on the reasonableness of any carrier practice. As contemplated by the savings clause of the Staggers Act, 49 U.S.C. § 10103, a common law remedy may coexist with the role of the ICC in regulating rail transportation.

If the ICC subsequently determines that rail carriers are abusing an exemption or that common law actions are advancing results inconsistent with the national transportation policy as expressed in 49 U.S.C. § 10101a, the Commission can revoke the exemption and reimpose regulation on the relevant rail traffic. *See* 49 U.S.C. § 10505(d). In this event, common law actions initiated after the exemption has been revoked would be preempted as inconsistent with the federal regulatory scheme. *Abilene,* 204 U.S. at 446, 27 S.Ct. at 357. But where the ICC has surrendered its regulatory jurisdiction, common law actions survive to provide a remedy to shippers injured by unjust discrimination at the hands of a rail carrier.

Conrail's argument also blurs the distinction between regulation of rail rates and adjudication of a tort between two parties. Citing *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.,* 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986), Conrail contends that recognizing a common law action for discriminatory rates would amount to *de facto* regulation of rail carriers. Conrail's reliance upon *Transcontinental* does not withstand analysis.

In *Transcontinental,* the Court decided whether state regulation was preempted by the deregulation of natural gas under the Natural Gas Policy Act of 1978. The Court did not consider whether the deregulated industry was freed from the obligations imposed by common law. Furthermore, the policy concerns of *Transcontinental* do not apply to the case at bar because courts adjudicate—they do not regulate. The power to regulate involves the power to develop legislatively-created standards and maxims before a dispute arises and to set rates and rules to be followed in the future. By contrast, the judicial exercise attempts to do justice between two parties in the limited context of a dispute that has already occurred. In the present case, the district court was called upon to adjudicate a tort claim filed by a shipper against a rail carrier for a discriminatory surcharge imposed on past shipments. As aptly stated by Professor Dworkin:

[J]udges neither should be nor are deputy legislators, and the familiar assumption, that when they go beyond political decisions already made by someone else they are legislating, is misleading. It misses the importance of a fundamental distinction ... between arguments of principle on the one hand and arguments of policy on the other.

Dworkin, *Hard Cases,* 88 Harv.L.Rev. 1057, 1058–62 (1975).

A decision by Congress that an area is best left unregulated takes away the regulatory authority of both federal and state regulatory agencies. *See Transcontinental,* 474 U.S. at 422, 106 S.Ct. at 717; *Illinois Comm. Comm'n v. ICC,* 749 F.2d 875, 877–78 (D.C.Cir.1984), *cert. denied,* 474 U.S. 820, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985). But I refuse to make the quantum leap from there to a conclusion that Congress has also closed the door to all judicial remedies when deregulation sets in. In enacting the Staggers Act, Congress did not intend to emasculate a body of common law, specifically contemplated by the savings clause of the Act, that was designed to remedy the discriminatory conduct Congress clearly intended to prevent. If Congress had intended to remove the common law remedy, it would have done so plainly and said so clearly.

## VI.

For the reasons presented, I would reverse the district court's grant of summary judgment.