# COLUMBIANA COUNTY PORT AUTHORITY, et al., Plaintiffs,

v.

# BOARDMAN TOWNSHIP PARK DISTRICT, Defendant.

## No. 5:01CV1127.

United States District Court,
N.D. Ohio,
Eastern Division.

July 6, 2001.

## MEMORANDUM ORDER AND OPINION [1]

ECONOMUS, District Judge.

This matter is before the Court upon the Complaint for declaratory and injunctive relief filed by Plaintiffs, Columbiana County Port Authority and Central Columbiana & Pennsylvania Railway, Inc. (collectively "Plaintiffs") (Dkt.# 1). By their Complaint, Plaintiffs assert the following claims: Count I—That the Plaintiffs are entitled to a declaratory judgment that the statutory condemnation authority granted to the Defendant, Boardman Township Park District, is preempted by Federal law, specifically the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, et seq.; [2] Count II—That the Plaintiffs are entitled to a declaratory judgment determining that they hold a valid easement and right-of-way which permits them to operate the railroad tracks which they acquired by order of the Surface Transportation Board ("STB"), a Federal agency; Count III—That the statutory condemnation authority granted to the Park District violates the Commerce Clause, Article I, Section 8 of the United States Constitution; Count IV—That Plaintiffs are entitled to a declaratory judgment that the order of the Mahoning County Court of Common Pleas did not grant the Park District ownership of the easement and right-of-way associated with the railroad tracks in issue in this matter (Dkt.# 1).

In conjunction with their Complaint, the Plaintiffs filed an Emergency Motion Seeking Entry of a Temporary Restraining Order (Dkt.# 5). On May 24, 2001, the Court granted the Plaintiffs' Motion for a Temporary Restraining Order (Dkt.# 7).[3] On June 6, 2001, a hearing was held on the Plaintiffs' request for a preliminary and permanent injunction, which the Court took under advisement. Pending the resolution of the Plaintiffs' request for an injunction, the Court continued the Temporary Restraining Order. On June 15, 2001, the parties submitted a Joint Stipulation that the Temporary Restraining Order would remain in effect pending the Court's resolution of the issues involved in this action (Dkt.# 17).

By Order filed June 21, 2001 (Dkt.# 18), the Court denied the Defendant's Motion to Dismiss (Dkt.# 6) with respect to the assertion that this Court is without subject matter jurisdiction. The Court reserved judgment on the remaining issues, including those raised by Defendant pursuant to FED. R. CIV. P. 12(b)(6).

### FACTS

Columbiana County Port Authority ("CCPA"), is a quasi-public agency organized under the laws of the State of Ohio. Central Columbiana & Pennsylvania Railway, Inc. ("CCPR"), an Ohio corporation, is a common carrier by railroad engaged in providing interstate rail freight service. Defendant, Boardman Township Park District ("Park District"), is a public agency as defined by the Ohio Revised Code. The Park District services the recreational and

---

1. The form of the Court's opinion which has been submitted for publication differs slightly in form from the Memorandum Opinion and Order issued to the parties. No substantive changes have been made.

2. The ICCTA amended and recodified the Interstate Commerce Act of 1978.

3. On May 24, 2001, the Court also ordered that pursuant to Fed.R.Civ.P. 65(a)(2) the trial of this action on the merits should be advanced and consolidated with the hearing on the Plaintiffs' application for a preliminary injunction.

enjoyment needs of residents of Boardman Township and the surrounding communities.

Prior to November 8, 1996, the Youngstown & Southern Railroad ("Y & S") owned the rail line between Youngstown, Ohio and Darlington, Pennsylvania (hereinafter "the Line"). (*See*, Plaintiffs' Ex. 1, *Railroad Ventures, Inc.—Abandonment Exemption—Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County, PA*, AB–556 (Sub–No. 2X), 2000 WL 1470451(ICC), at * 1 (STB October 4, 2000) ("*October Decision*").) On November 8, 1996, the Line was sold to Railroad Ventures, Inc. ("RVI"). (*See, id.;* Plaintiffs' Ex. 12, Quitclaim Deed, dated November 8, 1996, between RVI and Y & S.) Pursuant to the provisions of that Quitclaim Deed, Y & S transferred to RVI, its successors and assigns, all right, title and interest in and to all that land, property rights, right-of-way, track, track material, ties and buildings and/or easement(s) situate, lying and being in the Townships of Beaver and Boardman and the City of Youngstown, Mahoning County, Ohio hereinafter collectively designated "the Premises." (Plaintiffs' Ex. 12 at p. 1.) The Premises included specified parcels of land including real estate common to "the land now or formerly [owned by] Boardman Supply." (*Id.* at pp. 8–10.)

The Quitclaim Deed provides that the Premises were to be identified as "Being all or part of the same property acquired by Grantor or a predecessor of Grantor as set out in the deed books and pages, recorded in the Office of Public Records of Mahoning County, Ohio, set forth on Exhibit B, attached hereto and incorporated herein; LESS any interim conveyances of parcels or parts of parcels to third parties since date(s) of acquisition." (*Id.* at p. 12.) Plaintiffs' Ex. 14, which is the Y & S Valuation or "Right of Way and Track Map" designated "VS5–Ohio, Map 6," is specifically listed in Exhibit B to the Quitclaim Deed. The Y & S main line and its right-of-way, as well as the passing track, are openly displayed and delineated on this map, which was revised December 31, 1955. The interests conveyed to RVI by Y & S also included "all right, title and interest retained by [Y & S] in previously conveyed properties of which said Premises is a part." (Plaintiffs' Ex. 12 at p. 13.) Finally, the conveyance was "expressly made under and subject to all occupations, easements or rights-of-way, as evidenced by instruments of record or as may be apparent on the premises." (Plaintiffs' Ex. 12 at p. 13.)

On July 15, 1997, the STB approved the acquisition of the Line by RVI from Y & S. (*See, Stipulation of Facts* at ¶ 8.) On January 24, 2001, pursuant to Orders of the STB in its Docket No. AB–556 (Sub–No. 2X), *Railroad Ventures, Inc.—Abandonment Exemption—Between Youngstown, OH, and Darlington, PA, in Mahoning and Columbiana Counties, OH, and Beaver County*, RVI transferred all land, track and related material and property interests previously owned by Y & S to CCPA. (*See, Stipulation of Facts* at ¶ 16; Plaintiffs' Ex. 5 at ¶ 4.) Plaintiffs' Ex. 14 indicates that the passing track is parallel to the main line and extends in a northerly direction from Y & S Station 392 + 95.00 to Y & S Station 376 + 84.00. A team track, 363 feet in length, appears to extend in a northerly direction from a switch located on the passing track at Y & S Station 379 + 74. In addition, an industrial spur, which consists of two parallel tracks, approximately 600 feet in length, extends in a northerly direction from the passing track at Y & S Station 385 + 03. The location of the spur, which was misidentified prior to the hearing, was corrected during the course of the hearing and marked in red. (*See*, Tr. at 6.)

At an undetermined point in time, a portion of the passing track that was located north of Y & S Station 385 + 03, as well as the team track and the switches at Y & S Stations 379 + 74 and 376 + 84.00, were removed. (*See,* Tr. at 14, 21–22, 50. Plaintiffs' Ex. 5 at ¶ 10, and photograph 13.) The party responsible for removing the switches and rail has not been determined. The track was converted to a "doubling track" when the northern switch was removed. However, the conversion of the track did not affect the use of the track by either Y & S or PL & W. (*See,* Plaintiffs' Ex. 5 at ¶ 10; Tr. at 15, 49.) A portion of the industrial spur inside the Boardman Supply Company ("Boardman Supply") property was also removed when Boardman Supply constructed its new office building in 1994. (*See,* Tr. at 18.) The remaining portion of the spur remains in place, along with a loading dock that was put in to accept box cars when the new office building was constructed. (*See, id.*) The loading dock is adjacent to the industrial spur that extends off the passing track. Although the loading dock was built in 1994, it does not appear that rail service was provided to Boardman Supply following the conveyance of the real estate from Y & S to Boardman Supply. (*See,* Plaintiffs' Exhibit 5 at ¶ 9; *see also,* Tr. at 7, 18.) As a result, it appears that the rail operations conducted by Y & S and PL & W which utilized the passing track had nothing to do with delivering materials to Boardman Supply.

Mr. Walter J. Gane worked as a brakeman, conductor, fireman and engineer for Y & S from 1976 until 1993, and as the Superintendent for PL & W from 1993 until June 1995, when the Line was leased to Ohio and Pennsylvania Railroad Company ("O & P"). (*See,* Plaintiffs' Ex. 5 at ¶¶ 2 and 10.) Mr. Gane has testified that prior to the date that it ceased operations over the Line in 1993, Y & S used the passing track in the movement of interstate traffic. He has also testified that after PL & W replaced Y & S as the operator in 1993, PL & W continued using the passing track in the movement of interstate traffic. According to Mr. Gane, as a means to improve the efficiency of their line haul operations, both Y & S and PL & W split heavy trains into segments at the northern end of the Line in Youngstown. After pulling the first group of cars up the hill from Poland Avenue in Youngstown, the engineer would push them onto the passing track at the south switch, uncouple them and return with the locomotive to the bottom of the hill to pick up the balance of the cars. As Mr. Gane explained, the general practice is to keep the locomotive on the main line track and not to pull cars through a switch. Because the Line was embargoed following the subsequent sale of the Line to RVI in November 1996, few, if any, rail operations were conducted over the Line after RVI acquired the Line. (*October Decision* at *1, *2.) When the Line was operational, the passing track was not used for storage purposes. (*See,* Plaintiffs' Ex. 5 at ¶ 9.) When the Line was operational, the passing track was not used for loading, unloading or reloading. (*See,* Plaintiffs' Ex. 5 at ¶ 9.) As reflected by the Y & S valuation map and its track chart, it would be necessary to push cars through a switch located on the passing track onto an industrial spur in order to perform loading and unloading functions. (*See, id.* at Attachment 2; Plaintiffs' Ex. 14.) As reflected by the inventory that was included in the valuation study conducted by the expert witness who testified before the STB in support of RVI's abandonment petition, the line of railroad that is at issue herein was identified as being subject to the STB's abandonment jurisdiction. (*See,* Plaintiffs' Ex. 5, at Attachment 3.)

In performing rail operations over the Line, it is anticipated that CCPR will utilize the passing or doubling track in the

same manner as it was used by Y & S and its successors. (*See,* Plaintiffs' Ex. 5 at ¶ 12.) CCPR will also require the use of the passing track in order to reach the industrial spur that extends off of the passing track in order to deliver rail cars to Boardman Supply. (*See,* Plaintiffs' Ex. 5 at¶ 12 and Photographs 13–17.)

As described in a Limited Warranty Deed, dated September 1, 1988, duly recorded as Official Record 741, Office of Public Records of Mahoning County, Ohio, Y & S conveyed a parcel of land to Boardman Supply. Prior to the conveyance, the parcel of land was part of the Y & S's right-of-way. (*See,* Plaintiffs' Ex. 5 at Attachment 4; *see also,* Attachment 1 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.) The conveyance of the real estate to Boardman Supply was "expressly made under and subject to all public streets, roads, *easements and rights-of-way,* as evidenced by instruments of record or *as may be apparent on the premises* " (emphases added). (*See* Plaintiffs' Ex. 5 at p. 2 of Attachment 4; *see also* p. 2 of Attachment 1 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.) At the time of the 1988 conveyance, as well as now, the passing track and its right-of-way straddled the parcel of land that was conveyed to Boardman Supply and the right-of-way on which Y & S's main line is located. The track was, and today is, apparent on the premises. (*See,* Tr. at 45.) The rail that forms the west side of the passing track is located within the right-of-way of the main Line. (*See,* Plaintiffs' Exhibit 5 at ¶ 15 and Photographs 6–7 and 10–11, which show that the surveyor's stakes that establish the eastern boundary of the conveyed parcel are within the western rail of the passing track.)

No application to acquire the relevant track segment located on the parcel of real estate acquired by Boardman Supply was filed with the Interstate Commerce Commission ("ICC") by either Y & S or Boardman Supply, nor did Y & S seek authority from the ICC to abandon the passing track. (*See, Stipulation of Facts* at ¶ 7.) Following the sale of the real estate to Boardman Supply, Y & S and PL & W continued, without objection and without any further agreement with Boardman Supply, to use the right-of-way retained by Y & S, and to maintain the passing track located thereon, in their interstate rail operations until June 1995, when O & P assumed responsibility for operating the Line. (*See,* Plaintiffs' Ex. 5 at ¶¶ 9—10. Tr. 12.)

The testimony presented at the June 6, 2001, hearing indicated that Y & S never took any action to abandon the easement or right-of-way on which the passing track is located. Furthermore, the record shows that although RVI subsequently sought authority to abandon the interests that it acquired from Y & S, including all easements and rights-of-way, the STB compelled RVI to convey all of those interests to CCPA pursuant to the requirements of 49 U.S.C. § 10904.

On August 28, 1997 (after RVI caused all rail operations on the Line to be embargoed), the attorney for the Park District sent a letter to Boardman Supply in which he represented that he had been retained to represent the Park District in the acquisition of two parcels of real estate owned by Boardman Supply. The parcels were described as follows:

1) approximately 3.75 acres where the ball fields are now located; and

2) approximately .272 acres, which is a fifteen foot wide strip of property parallel to the Y & S tracks, running between

the park drive and the southern boundary of your property.

(Attachment 5 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.) On December 16, 1997, the Board of Park Commissioners of Boardman Township Park District adopted a *Resolution Declaring Necessity to Appropriate Certain Lands* ("the *Resolution*"). (*See,* Attachment 4 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.) According to the *Resolution,* the Park District intended to appropriate the following parcels of land:

### PARCEL 1

Situated in the Township of Boardman, County of Mahoning, State of Ohio, and known as being Parcel One in a Replat of Lot No 2 in Boardman Supply Co. Plat No. 1, as recorded in Volume 84, Page 180 of the Mahoning County Record of Plats, bounded and described as follows:

Beginning at an iron pin at the southeast corner of Great Lot 4, First Division, and the northeast corner of Great Lot 4, Second Division, on the west line of Great Lot 25, Third Division; thence S. 85° –38' –52"E. 46.15 feet to an iron pin and the TRUE PLACE OF BEGINNING;

Thence S. 85°–38'–52"e. 334.11 feet to an iron pin;

Thence S. 03°–52' 52"W.600.31 feet along the west line of lands deeded to Boardman Township Park by deed recorded in Vol. 602, Page 533 of the Mahoning County Record of Deeds, to an iron pin;

Thence N. 08°–5—59' 47"W. 618.60 feet along lands of The Ohio Edison Co. to the place of beginning, and containing within the above described bounds, 3.660 acres of land.

### PARCEL II

Situated in the Township of Boardman, County of Mahoning, State of Ohio, and known as being Parcel Two in a Replat of Lot No. 2 in Boardman Supply Plat Co. No. 1, as recorded in Volume 84, Page 180 of the Mahoning County Record of Plats, bounded as described as follows:

Beginning at an iron pin on the south line of Great Lot No.14, First Division, and on the original easterly line of the Youngstown and Southern Railroad;

Thence S. 07° –54'–32"E. 790.12 feet along the original side of said Railroad and the westerly line of land now or formerly owned by the Ohio Edison Company to an iron pin;

Thence S.82° –085'–28"W. 15.00 feet to an iron pin;

Thence N.07° –54'32"W. 793.38 feet along a line 15 feet from the centerline of the Railroad to an iron pin;

Thence S. 85°11–11–38'–52"E.15.35 feet to the place of beginning, and containing within the above-described bounds, 0.273 acre of land.

(*Stipulation of Facts* at ¶ 11.) This case involves the land described as "Parcel II." The resolution does not indicate that it intended to acquire any easements that were owned by any entity. In particular, the resolution does not mention RVI.

On February 4, 1998, a Complaint was filed in the Mahoning County Court of Common Pleas by the Park District against Boardman Supply, James Pipoly, Bank One, N.A., Boardman Community Baseball and the Mahoning County Treasurer. The case (hereinafter referred to as "the *Appropriation Action*") was assigned Case No. 98 CV 0291. (*See,* Attachment 5 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.)

In September of 1998, a jury trial was conducted in conjunction with Case No. 98 CV 0291. On September 25, 1998, a verdict was returned in favor of Boardman Supply in the amount of $80,000. (*See*, Attachment 6 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.)

On October 2, 1998, a Judgment Entry was filed in the *Appropriation Action* which, in addition to authorizing the acquisition of the land, also authorized the acquisition of an easement that was the subject of a prior judgment. (*See*, Attachment 7 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss.)

On February 22, 1999, after the filing of several post-trial motions, a "Nunc Pro Tunc Judgment Entry amending the Judgment Entry of October 2, 1998" was issued. As recognized therein, the "Judgment Entry" of October 2, 1998 "wrongfully grants Plaintiff Boardman Township Park District more of the Defendants' property rights than what was legally appropriated by resolution and complaint filed by the Plaintiff." (*See*, Attachment 8 to the Affidavit of Daniel N. Slagel, Ex. A to the Motion of Defendant Boardman Township Park District to Dismiss; Plaintiffs' Ex. 9.) As further explained in a Judgment Entry, which was also dated February 22, 1999, because the Park District's *Resolution* did not mention the easement, neither the court nor counsel could enlarge the appropriation. (*See*, Plaintiffs' Ex. 9.) As the result of the February 22, 1999 Judgment Entries filed in the Mahoning County Court of Common Pleas in conjunction with the appropriation action, the Park District acquired the real estate interests previously held by Boardman Supply, namely the .272 acres on which the relevant track segment is

partially located. The Park District did not acquire any of the interests in the parcel of real estate that were retained by Y & S when it conveyed the parcel to Boardman Supply and subsequently conveyed to RVI in 1996.

In January 2001, nearly two years after the conclusion of the *Appropriation Action*, RVI transferred all land, track and related material and property interests previously owned by Y & S to CCPA pursuant to the provisions of 49 U.S.C. § 10904. As required by the STB's *October Decision*, the transfer included all track and track materials that are attached to the main line or a branch line. (*See*, Plaintiffs' Ex. 1 at *7.) According to the STB, such track included all "spur, industrial and side track needed to physically reach the shippers' facilities (for loading and unloading traffic) or the passing and switching track that is needed for operating trains and interchanging traffic moving onto or off of the line." Although the Park District participated in the STB proceedings in support of RVI, the Park District did not challenge the STB's reasoning expressed in the previous paragraph. And, after seeking judicial review, neither RVI nor the Park District challenged the STB's reasoning in their briefs filed with the United States Court of Appeals for the Sixth Circuit.

## ANALYSIS

For all the reasons stated in its June 21, 2001 Order, this Court has subject matter jurisdiction to hear this action (Dkt.# 18).

The initial issue to be determined is whether the stretch of track that is partially located on the parcel of real estate conveyed to Boardman Supply in 1988 by Y & S is a "line of railroad." In *New Orleans Terminal Company v. Spencer*, 366 F.2d 160, 164 (5th Cir.1966), *cert. denied*, 386 U.S. 942, 87 S.Ct. 974, 17

L.Ed.2d 873 (1967), the Fifth Circuit held that

> Whether a particular stretch of rail is a line of railroad, or is an extended line of railroad or is a spur, industrial, team, switching or side track, is a mixed question of law and fact to be determined judicially rather than administratively. *United States v. Idaho,* 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070.

As further explained in *Nicholson v. I.C.C.,* 711 F.2d 364, 367 (D.C.Cir.1983), *cert. denied,* 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984):

> It is well established that the determination of whether a particular track segment is a "railroad line," requiring Commission authorization pursuant to section 10901(a), or a "spur, industrial, team, switching, or side" track, exempt from Commission jurisdiction pursuant to section 10907(b),* turns on the intended use of the track segment, not on the label or cost of the segment. It was held early on that it is sufficiently plain, from a consideration of not only the obvious purpose prompting the {Interstate Commerce Act} but also of the general nature of the tracks mentioned, that Congress intended *to subject to the requirements of [former] {section 1(18)}* so-called main or branch lines of railroad, that is, *lines designed and used for continuous transportation service by through, full trains between different points of shipment or travel, and to exclude* from the operation of the statute *all that mass of "tracks"* (as distinguished from "lines") naturally and necessarily *designed and used for* loading, unloading, *switching,* and other *purposes connected with, and incidental to,* but not actually and directly used for, *such transportation service.* (* footnote omitted, emphases in original).[4]

█ The facts set forth in the unchallenged affidavit of Walter Gane and in RVI's abandonment petition filed with the STB demonstrate that the track in question is a line of railroad subject to the STB's jurisdiction:

● The track was used primarily in the through movement of interstate traffic to shippers other than Boardman Supply. Following the sale of the underlying real estate to Boardman Supply, the track was exclusively used in the through movement of interstate traffic. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane at ¶ 9; and Plaintiffs' Exhibit 7, Affidavit of James G. Pipoly, at ¶ 8.

● The track, which is composed of heavier weight rail, was constructed within the original right-of-way of the Y & S as a passing track. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, Attachments 1 through 3.

● After the 1988 sale of real estate to Boardman Supply, the track, which was then being used solely for interstate operations, was maintained by the operating railroads. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 21; and Plaintiffs' Exhibit 7, Affidavit of James G. Pipoly, at ¶ 3; Tr. 12.

---

4. Congress first codified the provisions of the Interstate Commerce Act in 1978. Prior to that time the provisions of sections 10901 and 10907 were found at section 1(18) of the Act. The 1978 codification made no substantive changes in these provisions. In 1995, Congress enacted the ICC Termination Act ("ICCTA"), Pub.L. No. 104–88, 109 Stat 803. As herein pertinent, ICCTA renumbered § 10907 as § 10906. In addition, ICCTA bestowed exclusive jurisdiction under 49 U.S.C. § 10501(b)(2) on the STB over the "acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State."

• Only the eastern portion of the track is situated on the parcel of real estate that is owned by the Park District. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 19.

• The track was used for purposes other than storage. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 9.

• The track was used for purposes other than loading, unloading or reloading. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 9. As indicated on the Y & S valuation map and by its track chart, it would be necessary to push cars though a switch onto an industrial spur to perform loading and unloading functions. *Id.* at Attachment 2 and Plaintiffs' Ex. 14.

• There are no loading facilities on the passing track. The dock facilities are located inside the Boardman Supply fence next to the spur which extends at an angle off of the former passing track. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at Photographs 16 and 17.

• As reflected by the inventory that was included in the valuation study conducted by the expert witness who testified before the STB in support of RVI's abandonment petition, the rail that is at issue herein was identified as being subject to the STB's abandonment jurisdiction. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at Attachment 3.

• CCPR will utilize the passing or doubling track in the same manner as it was used by Y & S and its successors. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 12.

• CCPR also requires the use of the track in order to reach the industrial spur that extends off of it in order to deliver rail cars to Boardman Supply. *See* Plaintiffs' Exhibit 5, Affidavit of Walter J. Gane, at ¶ 12 and Photographs 13–17.

The foregoing indicia concerning the actual past and intended use of the track segment conclusively demonstrate that the track served as an integral and vital part of the through movement of goods by Y & S and PL & W in interstate and foreign commerce to various shippers, both prior to, and after, the conveyance of the parcel of real estate on which the passing track is partially located. As a result, the track is a line of railroad under the governing precedents of the courts, the ICC and the STB. *See New Orleans Terminal Company v. Spencer, supra,* 366 F.2d at 164; *Nicholson v. ICC, supra,* 711 F.2d at 367–8; *CNW—Aban. Exemp.-In McHenry County, IL,* 3 I.C.C.2d 366 (1987), *rev'd on other grounds sub nom. Illinois Commerce Com'n v. ICC,* 879 F.2d 917 (D.C.Cir.1989); *Battaglia Distributing Co., Inc. v. Burlington Northern R. Co.,* 2 S.T.B. 323 (1997).

Because the track in question is a "line of railroad," the prior approval of the ICC would have been required before Boardman Supply could have lawfully acquired the track in 1988. The ICC's jurisdiction to approve the acquisition of a line of railroad was exclusive and plenary. 49 U.S.C. §§ 10501(b), 10901 (1982); *Pittsburgh & Lake Erie Railroad Company v. Railway Labor Executives' Association,* 491 U.S. 490, 498, 109 S.Ct. 2584, 2596, 105 L.Ed.2d 415 (1989). ("The proposed sale of assets could not be carried out without compliance with the terms of the [Interstate Commerce Act], 49 U.S.C. § 10901, which requires that noncarriers seeking to acquire a rail line first obtain a certificate of public convenience and necessity from the ICC.")

▮ Even if it were to be assumed that the passing track was other than a line of railroad, the conclusion would still have been reached that the Park District's acquisition of the parcel of real estate from

Boardman Supply was subject to an easement for continued rail service. Under Ohio law, an easement is an interest in the land of another which entitles the owner of the easement to a limited use of the land on which the interest exists. 36 Ohio Jurisprudence 3d 386, Easements and Licenses, Section 1. As explained in *Cincinnati, Hamilton & Dayton Ry. Co. v. Wachter* (1904), 70 Ohio St. 113, 118, 70 N.E. 974:

> An easement implies necessarily a fee in another, and it follows that it is a right, by reason of such ownership, to use the land for a special purpose, and one not inconsistent with the general property in the land of the owner of the fee, his property rights, however, to be exercised in such way as not to unreasonably interfere with the special use for which the easement was acquired.

By the Limited Warranty Deed, dated September 1, 1988, Y & S conveyed the parcel of land to Boardman Supply which lies under the eastern portion of the passing track. That conveyance was "expressly made under and **subject to all** public streets, roads, **easements and rights-of-way,** as evidenced by instruments of record or **as may be apparent on the premises**" (emphasis added). For all the following reasons, it must be concluded that Y & S retained an easement and right-of-way when it sold the real estate to Boardman Supply.

As demonstrated by Mr. Gane's uncontested testimony, Y & S and its predecessors continued to have unrestricted access to the real estate following its conveyance to Boardman Supply. The uncontroverted testimony of Mr. Gane demonstrates that the track, which was and is "apparent on the premises," was maintained and utilized by Y & S and PL & W as part of their interstate rail operations for several years after the real estate was conveyed to Boardman Supply. There is no indication that Boardman Supply ever took any steps

to deny Y & S or PL & W access to the property or to terminate their use of the easement and right-of-way. During his oral testimony, Mr. Pipoly confirmed that no instructions were ever given to the railroad following the conveyance that the railroad was not permitted to use the track that was on the parcel of land that had been conveyed to Boardman Supply. (*See,* Tr. at 19.)

At no time was any attempt made by Y & S or PL & W to seek the ICC's or the STB's prior approval to abandon the passing track or discontinue operations over that track. Given the fact that the line physically straddles the property owned by CCPA and the property that is now owned by the Park District, coupled with its prior and anticipated use, it would be necessary to obtain the STB's approval to abandon the passing track. Indeed, when RVI sought to abandon the Line, it included the passing track in the list of tracks that were to be abandoned along with the main line. Although the team track at the northern end of the passing track, as well as the northernmost switches were removed at some undetermined time, the removal of that track did not impact the continuing interstate operations that were conducted by Y & S and PL & W. (*See,* Tr. at 49–50.)

By its Complaint filed February 4, 1998 in the Court of Common Pleas of Mahoning County, Ohio, the Park District sought to acquire designated property from the following defendants: Boardman Supply Company, James Pipoly, Bank One, N.A., and Boardman Community Baseball. *See* Attachment 5 to Affidavit of Daniel N. Slagle, Jr., submitted in Opposition to Plaintiff's (sic) Motion for Injunctive Relief. After taking judicial notice of the Resolution, the Complaint and the Judgments entered by the Court of Common Pleas of Mahoning County, there is no indication that Park District sought to ac-

quire the easement and right-of-way that was retained by Y & S when it conveyed the parcel of real estate underlying the track to Boardman Supply in 1988. (*See*, Tr. at 23.)

Although the Court of Common Pleas authorized the appropriation of the real estate, the court properly recognized that it lacked jurisdiction to authorize the appropriation of any interests in the real estate, including easements, that had not been legally appropriated by resolution of the Park District's Board. Nunc Pro Tunc Judgment Entry filed February 22, 1999. (*See,* Plaintiffs' Ex. 9.) When the Park District initiated the appropriation case against Boardman Supply in 1998, the easement and right-of-way retained by Y & S had already been conveyed to RVI. (On November 8, 1996, the Line was sold to RVI.) Pursuant to the provisions of the Quitclaim Deed which memorialized the sale, Y & S transferred to RVI, its successors and assigns, all right, title and interest in and to all that land, property rights, right-of-way, track, track material, ties and buildings and/or easement(s) situate, lying and being in the Townships of Beaver and Boardman and the City of Youngstown, Mahoning County, Ohio hereinafter collectively designated "the Premises." (Plaintiffs' Ex. 12 at p. 1.) The Premises included specified parcels of land including real estate common to "the land now or formerly [owned by] Boardman Supply." (*Id.* at pp. 8–10.)

The Quitclaim Deed provides that the Premises were to be identified as "Being all or part of the same property acquired by Grantor or a predecessor of Grantor as set out in the deed books and pages, recorded in the Office of Public Records of Mahoning County, Ohio, set forth on Exhibit B, attached hereto and incorporated herein; Less any interim conveyances of parcels or parts of parcels to third parties since date(s) of acquisition." (*Id.* at p. 12.

Plaintiffs' Ex. 14, which is the Y & S Valuation or "Right of Way and Track Map" designated "VS5–Ohio, Map 6," is specifically listed in Exhibit B to the Quitclaim Deed.) The interests conveyed to RVI by Y & S also included "all right, title and interest retained by [Y & S] in previously conveyed properties of which said Premises is a part." (Plaintiffs' Ex. 12 at p. 13.) Finally, the conveyance was "expressly made under and subject to all occupations, easements or rights-of-way, as evidenced by instruments or record or as may be apparent on the premises." (Plaintiffs' Ex. 12 at p. 13.) By virtue of the express terms of the November 8, 1996 Quitclaim Deed, the Court concludes that RVI acquired the easement and right-of-way retained by Y & S when it sold the parcel of real estate to Boardman Supply in 1988. The easement was not a subject of the subsequent appropriation proceeding brought by Park District against Boardman Supply.

In May 1999, RVI filed a petition with the STB asking that "it be allowed to abandon the line and that O & P be relieved of its service obligations over the line" (*October Decision* at 2). RVI specifically listed the track that is at issue herein on the inventory of track that it had acquired from Y & S. In exercising its authority under 49 U.S.C. § 10904, the STB authorized CCPA to acquire all "the property the selling/abandoning carrier (or its predecessor) assembled for, and dedicated to, rail service." (*October Decision* at *6.) The STB also ordered that "RVI shall convey to CCPA all land, track, and related material, and property interests covered by our previous order, *as clarified here,* within 45 days of the date of service of this decision according to the terms of closing stated in this decision" (emphasis added). (*Id.* at *11.) As the STB expressly explained, the conveyance would include more than the main line track. Otherwise, the new railroad:

could not provide continued rail service if it were deprived of the spur, industrial and side track needed to physically reach the shippers' facilities (for loading and unloading traffic) or the passing and switching track that is needed for operating trains and interchanging traffic moving onto or off of the line.

(*Id.* at *7.) As the STB also explained, the track to be conveyed would include all track, including spurs and side tracks, that were attached to the mainline. Track that had been "retained for possible future rail use" was included also, even though it had not been used for years, so long as it had not been abandoned. (*Id.* at *12, n. 34.)

Based on the provisions of 49 U.S.C. § 10906, which excepts side and spur tracks from the STB's authority, RVI advanced the same argument before the STB that now is raised by the Park District herein, namely that "a forced sale under section 10904 may not include any spur, industrial, team, switching or side tracks." (*Id.* at *7.) The STB rejected that argument as follows:

> It does not follow, however, that, where such tracks are attached to a main line or branch line for which abandonment authority is required, they cannot be included in a forced sale under section 10904. Indeed, Congress could not have intended such a result, as it would defeat the very purpose of section 10904.

Although RVI argued before the STB that such tracks had been excepted from the STB's jurisdiction by the terms of 49 U.S.C. § 10906, this particular finding was not challenged by RVI on judicial review. Moreover, at no time did RVI ever suggest that it did not own any piece of track that was included in its inventory of track listed

in its abandonment petition (Plaintiffs' Ex. 5, Attachment 3), nor did the Park District assert any ownership interest in the Line or the passing track.

By Quitclaim Deed, dated January 23, 2001, RVI conveyed "all right, title and interest in and to all that land, proper rights, right-of-way, track, track materials ... and/or easements situated ... in the Townships of Beaver and Boardman and the City of Youngstown" to CCPA. (Defendant's Ex. B. at p. 1.) The grant also included:

> all right, title, and interest of [RVI], and any predecessors of Grantor, created and/or held by the hostile, actual, visible, exclusive and notorious occupation of all or any portions of the Premises, for a continuous period or twenty-one (21) years or more prior to the date of this conveyance; including all interests, rights, privileges excepted, reserved or retained in any of the interim outgrants unto the proper use, benefit and enjoyment of [CCPA, CCPA's] successors and assigns, forever.

As reflected by Ex. 14, the passing track at issue in this case has been in place well over twenty-one years.

The Park District participated in the OFA process and challenged various aspects of the STB's decisions.[5] However, the Park District did not take issue with the STB's conclusion that section 10904 would include "any spur, industrial, team, switching or side tracks" that were attached to the main track and that had not been abandoned. Furthermore, the Park District did not contest the STB's conclusion in its brief filed with the United States Court of Appeals for the Sixth Circuit.[6] Indeed, it was only after it learned

---

5. The "OFA process" occurs pursuant to 49 U.S.C. § 10904, which authorizes the STB to offer financial assistance to avoid the abandonment and discontinuance of interstate rail service over a particular line of railroad.

6. Although Plaintiffs specifically raised the issue of whether the Park District had challenged the STB's reasoning either before the STB or the Sixth Circuit in their Brief in

that CCPR was repairing the industrial spur that leads to the facilities of Boardman Supply that the Park District belatedly claimed to own the passing track that is located on the real estate that it acquired from Boardman Supply in February 1999 through the appropriation process.

■ The Park District may not relitigate the issue of whether the sale of spur and side tracks can be the subject of a forced sale under section 10904 before this Court. Simply stated, this Court may not take any action that would serve to modify or rescind the STB's Decisions governing the sale of a line of railroad pursuant to 49 U.S.C. § 10904. *See, Railway Labor Executives' Association v. Staten Island Railroad Corporation,* 792 F.2d 7, 11–12 (2nd Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987). Having failed to challenge the STB's conclusion in a timely fashion before the Court of Appeals, the Park District's collateral attack on the STB's decision is barred both by considerations of res judicata and the statute of limitations imposed by 28 U.S.C. § 2344. *Cf. Califano v. Sanders,* 430 U.S. 99, 108, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *U.S. v. Metropolitan Petroleum Co., Inc.,* 743 F.Supp. 820 (S.D.Fla.1990).

■ Even though it failed to pursue judicial review of the STB's determination that the sale to CCPA included all track, including spurs and side tracks, that were attached to the mainline as well as track that had been "retained for possible future rail use," the Park District nonetheless seeks to avoid the effect of the STB's prior determination. However, the Park District is precluded from raising any defense in this matter that would, in effect, countenance a collateral attack on the STB's order. As has been recognized, "adminis-

trative determinations usually have res judicata effect '[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.' " *Hayfield Northern Railroad Co., Inc. v. Chicago & North Western Transportation Co.,* 467 U.S. 622, 636, n. 15, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984), *citing United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

■ Wholly aside from the Park District's apparent failure to challenge the STB's determination, this Court must accept the STB's determination as being "the product of expert judgment which carries a presumption of validity." *Interstate Commerce Commission v. Jersey City,* 322 U.S. 503, 512, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944). This is particularly true given the exclusive jurisdiction of the Court of Appeals to review and set aside (in whole or in part) a final order of the STB, "Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," and as such, an agency's interpretation of its governing statute is entitled to great deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this instance, the STB has definitively ruled that for purposes of an OFA under 49 U.S.C. § 10904, the STB may include both side and spur tracks that are connected to a main line, so long as they have not been abandoned, if they are required to preserve rail service. Plainly, the track has never been abandoned and is connected to the main track at the southern end of the passing track. Because this Court lacks jurisdiction to set

---

Support of Declaratory and Injunctive Relief filed May 30, 2001 before this Court (Dkt.# 10), the Park District has not taken

issue with the Plaintiffs' representation that no such challenge was made by the Park District.

aside the STB's determination, the Park District cannot force collateral redetermination of this issue in this Court by insisting that the STB acted beyond its jurisdiction and contrary to 49 U.S.C. § 10906.

Even if this Court were to find that the track in question is a spur or side track as the Defendant has claimed, such a determination would not authorize the Park District, through the State appropriation process, to compel discontinuation of rail service over the track. If the Court were to bar CCPA from operating over the track in question, it would impermissibly intrude on the exclusive jurisdiction of the Sixth Circuit as well as interfere with "[t]he *exclusive* and *plenary* nature of the [STB's] authority" with respect to the abandonment process. *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321, 101 S.Ct. 1124, 1132, 67 L.Ed.2d 258 (1981). As explained in *Wisconsin Central Ltd. v. City of Marshfield*, No. 99–C–0636–S, 2000 U.S. Dist. LEXIS 10570, at *4 (W.D.Wis. February 10, 2000)("*Wisconsin Central*"), which is a recent case that involves a factual situation that is similar to that herein:

> Federal preemption doctrine is rooted in the Supremacy Clause which reads: "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to this provision Congress may preempt state law in the legitimate exercise of its legislative authority. *See Time Warner Cable v. Doyle*, 66 F.2d [F.3d] 867, 874 (7th Cir.1995)(*citing Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)).

It was also recognized (*id.* at *5) that there are three circumstances in which preemption occurs:

> "(1) express preemption where Congress explicitly preempts state law; (2) implied preemption where Congress has occupied the entire field (field preemption); and (3) implied preemption where there is an actual conflict between federal and state law (conflict preemption)." *Garcia [Gracia] v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir.1997)(*citing English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)).

The instant case reflects both express and implied preemption.

■ There is no doubt concerning the ability and intent of Congress to exercise its authority under the Commerce Clause to preempt State laws affecting rail transportation. As noted in *City of Auburn v. U.S.*, 154 F.3d 1025, 1029 (9th Cir.1998), *cert. denied*, 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d 771 (1999):

> Congress and the courts long have recognized a need to regulate railroad operations at the federal level. Congress' authority under the Commerce Clause to regulate the railroads is well established, *see, e.g., Houston, E. & W. Tex. Ry. v. United States*, 234 U.S. 342, 350–52, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), and the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area. *See, e.g., Colorado v. United States*, 271 U.S. 153, 165–66, 46 S.Ct. 452, 70 L.Ed. 878 (1926) (ICC abandonment authority is plenary and exclusive); *Transit Comm'n v. United States*, 289 U.S. 121, 127–28, 53 S.Ct. 536, 77 L.Ed. 1075 (1933) (ICC authority over interstate rail construction is exclusive); *City of Chicago v. Atchison, T. & S.F. Ry.*, 357 U.S. 77, 88–89, 78 S.Ct. 1063, 2 L.Ed.2d 1174

(1958)(local authorities have no power to regulate interstate rail passengers). The Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, as amended, still governs federal regulation of railroads, has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).*

---

* In 1980, Congress took additional steps to reduce regulatory authority of the states over interstate rail lines by passing the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980). Before 1980, the ICC was empowered to preempt state regulation of intrastate lines only when an intrastate rate set by the state unjustly discriminated against or imposed an undue burden on interstate commerce. In the Staggers Act, Congress expressly provided that states could only regulate if they applied federal standards. *See Interstate Commerce Comm'n v. Texas*, 479 U.S. 450, 453–54, 107 S.Ct. 787, 93 L.Ed.2d 809 (1987).

With the enactment of ICCTA, effective January 1, 1996, Congress codified an explicit preemption clause at 49 U.S.C. § 10501(b)(2), which provides that:

Except as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

"Transportation," in turn, is broadly defined at 49 U.S.C. § 10102(9) and includes:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

The courts that have considered the preemption issue following ICCTA's enactment have consistently found that the foregoing preemption clause is both clear and broad. *See, e.g., CSX Transp. Inc. v. Georgia Pub. Serv. Comm'n*, 944 F.Supp. 1573, 1581 (N.D.Ga.1996); *City of Auburn v. U.S. supra*, 154 F.3d at 1030; *Wisconsin Central, supra*, 2000 U.S. Dist. LEXIS 10570 at *8:

The Court agrees with these courts in their reading of the broad preemptive language of the ICCTA. The preemption provision makes all ICCTA remedies exclusive and explicitly preempts all other Federal and State remedies. It is clear that the ICCTA has preempted all state efforts to regulate rail transportation.

ICCTA also evidences the intent of Congress to preempt the field in which state law previously operated with respect to railroads. In particular, Congress granted the STB exclusive jurisdiction over all matters of rail transportation, including intrastate railroad tracks. *See* 49 U.S.C. § 10501(b)(2). As reiterated in *Wisconsin Central*, citing *CSX Transp. Inc. v. Georgia Pub. Serv. Comm'n, supra*, 944 F.Supp. at 1584:

With the extension of exclusive federal jurisdiction over wholly intrastate tracks, one of the few railroad matters previously within the jurisdiction of the states, the ICC Termination Act evinces an intent by Congress to assume complete jurisdiction, to the exclusion of the states, over the regulation of railroad operations.

When applied to a line of railroad or track, a state's appropriation process constitutes regulation. As reasoned in *Wisconsin Central, supra*, at *9 with respect to the use of a state's power of eminent domain, "[i]n using state law to condemn the track, [the City] is exercising control—the most extreme type of control—over rail trans-

portation." Therefore, the Park District may not "subject to State law property that Congress specifically put out of reach." *Id.* at *10. In this regard, it must be remembered that the Judgment of the Court of Common Pleas was entered over four years *after* ICCTA's enactment.

■ State law is also preempted to the extent that it conflicts with federal law by standing "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). In this case, the State appropriation process is preempted insofar as it would interfere with the well-recognized Congressional intent to preserve *rail service* through the OFA procedures, now codified at 49 U.S.C. § 10904. The aim of this section is "not simply the maintenance of rail *lines* but the continuation of rail *service.*" *Consolidated Rail Corp. v. ICC*, 29 F.3d 706, 712 (D.C.Cir.1994) (emphases in original). As the Supreme Court observed in *Hayfield Northern Railroad Co., Inc. v. Chicago & North Western Transportation Co., supra,* 467 U.S. at 630, 104 S.Ct. 2610, "[t]he underlying rationale of [§ 10904] represents a continuation of Congress' efforts to accommodate the conflicting interest of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service."

■ Because the State appropriation process interferes and conflicts with the OFA process and the preservation of rail service, it is preempted and is without effect. As the Supreme Court explained in *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., supra,* 450 U.S. at 317, 101 S.Ct. at 1130:

when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law preempted by federal regulation whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), quoting *Hines v. Davidowitz.*

Moreover, as reflected by the Nunc Pro Tunc Judgment, the Court of Common Pleas correctly recognized that it could not authorize the appropriation of easements that had not been appropriated by the Park District. In the absence of any showing that the Park District actually appropriated the easement interest that was owned by RVI following its acquisition of the Y & S interests in November 1996, the Park District lacks any legal or equitable basis for claiming ownership of the easement and may not legally bar CCPA and CCPR from providing rail service using the track. However, to the extent that the Court of Common Pleas may have authorized the appropriation of the easement and right-of-way then owned by RVI, its action was preempted by the ICCTA and is without effect.

### CONCLUSION

Based on the evidence of record and for all the reasons stated above, Plaintiffs are entitled to the relief sought as a matter of law. Accordingly, Plaintiffs' request for declaratory and injunctive relief (Dkt.# 1) is **GRANTED as to all counts.** Furthermore, as the Court consolidated the hearing of Plaintiffs' motion with a trial of this action on the merits pursuant to FED. R. CIV. P. 65(a), **JUDGMENT** shall be entered as follows:

A. The statutory condemnation authority granted to the Park District is preempted by Federal law, specifically the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101, *et seq.*

B. Plaintiffs hold a valid easement and right-of-way which permits them to main-

tain and operate the railroad tracks which they acquired by Orders of the STB issued pursuant to 49 U.S.C. § 10904.

C. Insofar as it could be read to authorize the appropriation of the easement and right-of-way then owned by RVI and subsequently conveyed to CCPA, the statutory condemnation authority granted to the Park District violates the Commerce Clause, Article I, Section 8 of the United States Constitution.

D. The order of the Mahoning County Court of Common Pleas did not grant the Park District ownership of the easement and right-of-way associated with the railroad tracks in issue in this matter.

E. Boardman Township Park District is permanently enjoined from taking any action that would interfere with maintenance and rail operations over the right-of-way and easement located on the parcel of land that was acquired from Boardman Supply in 1999.

Finally, a hearing shall be held on a date to be determined by the Court on the issue of attorney fees.

**IT IS SO ORDERED.**