# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WASTE MANAGEMENT OF WASHINGTON, INC., WASTE MANAGEMENT DISPOSAL SERVICES OF OREGON, INC., MJ TRUCKING & CONTRACTING, and DANIEL ANDERSON TRUCKING AND EXCAVATION, LLC, | No. 56291-0-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, an agency of the State of Washington, | |
| Respondent. | |

MAXA, J. – Murrey's Disposal Company, Inc. (Murrey's) filed two complaints with the Washington Utility and Transportation Commission (WUTC) against Waste Management of Washington, Inc. (WMW), Waste Management Disposal Services of Oregon, Inc. (WMDSO), MJ Trucking & Contracting (MJ Trucking), and Daniel J. Anderson Trucking and Excavation, LLC (DAT) (collectively, Waste Management). Murrey's asked the WUTC to issue an order directing these entities to cease and desist from engaging in the collection and transportation of solid waste from two paper mills in Clallam and Jefferson Counties. Waste Management appeals the WUTC's order granting Murrey's motion for summary determination and issuing the cease and desist order.

No. 56291-0-II

Two paper companies in Clallam and Jefferson Counties contracted with WMDSO to collect, transport, and dispose of their solid waste at WMDSO's Columbia Ridge Landfill. WMDSO subcontracted with MJ Trucking and DAT to transport waste-filled cargo containers by truck to transfer stations operated by WMW and others, where the containers were loaded onto rail cars for transportation via railroad to Columbia Ridge.

Under Washington law, an entity must obtain a certificate of authority from the WUTC to collect solid waste. Murrey's had authority from the WUTC to collect solid waste in Clallam and Jefferson Counties. WMW, WMDSO, MJ Trucking, and DAT did not have WUTC certificates of authority to operate as solid waste collection companies in Clallam or Jefferson Counties. Therefore, their solid waste collection activities violated Washington law.

However, Waste Management argues that federal law regarding rail transportation preempts Washington law because the various entities were providing train-on-flatcar/container-on-flatcar (TOFC/COFC) service that in part involved transportation of the solid waste on rail cars.[1] Waste Management identifies two sources of preemption. First, 49 U.S.C. § 10501(b)(1) states that the Surface Transportation Board (STB), formerly the Interstate Commerce Commission (ICC), has exclusive jurisdiction over "transportation by rail carriers" and that the regulation of rail transportation preempts state law remedies. Waste Management claims that "transportation by rail carrier" includes both the motor carrier leg and the rail leg of TOFC/COFC service.

---

[1] "Trailer-on-flatcar (TOFC or 'piggyback') service, a form of mixed train and truck transportation, enables a carrier to transport a trailer and its contents over rail on a flatcar and then haul the trailer on the highway. The goods need not be unloaded and reloaded when they move from rail mode to truck mode; the shipment remains within the trailer or container during the entire journey." *Interstate Com. Commc'n v. Texas*, 479 U.S. 450, 451, 107 S. Ct. 787, 93 L. Ed. 2d 809 (1987). Container-on-flatcar (COFC) involves a container that must be placed on a truck trailer for transportation. *Id.* at 452 & n.1.

2

No. 56291-0-II

Second, 49 U.S.C. § 10502 authorizes the STB to exempt certain services from federal regulation. An STB regulation, 49 C.F.R. § 1090.2, states that "highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt" from federal regulation "regardless of the type, affiliation, or ownership of the carrier performing the highway portion of the service." Waste Management claims that this exemption from federal regulation of the motor carrier leg of TOFC/COFC service shows that the STB has exercised its exclusive jurisdiction over those services and therefore that preemption applies.

We hold that 49 U.S.C. § 10501(b) and 49 C.F.R. § 1090.2 do not preempt Washington law regarding Waste Management's solid waste collection activities. Accordingly, we affirm the WUTC's summary determination order.

## FACTS

*Background*

McKinley Paper is a paper mill in Port Angeles, located in Clallam County. Port Townsend Paper is a paper mill in Port Townsend, located in Jefferson County. Both facilities generate solid waste in the form of old corrugated cardboard (OCC) rejects.

Murrey's has a certificate of authority from the WUTC to collect solid waste in Clallam and Jefferson Counties. Murrey's previously collected and disposed of OCC rejects from both McKinley Paper and Port Townsend Paper.

WMDSO owns and operates the Columbia Ridge Landfill in Arlington, Oregon. In 2020, McKinley Paper and Port Townsend Paper contracted with WMDSO to collect, transport, and dispose of their OCC rejects at Columbia Ridge.

3

No. 56291-0-II

WMDSO subcontracted with MJ Trucking to collect and transport waste-filled TOFC/COFC cargo containers by truck from McKinley Paper to the Olympic View Transfer Station in Kitsap County (which WMW operates), North Mason Fiber Company in Mason County, or Union Pacific Railroad's Argo Yard in Seattle. WMDSO subcontracted with DAT to collect and transport waste-filled TOFC/COFC cargo containers by truck from Port Townsend Paper to the Olympic View Transfer Station or to North Mason Fiber Company.

Once the containers arrived at the Olympic View Transfer Station, North Mason Fiber Company or the Argo Yard, the containers of solid waste were loaded onto rail cars and Union Pacific transported them via railroad to Columbia Ridge under a contract with WMDSO. The closed containers were not unloaded during this process.

WMDSO has no authority from the WUTC to collect solid waste. WMW has WUTC authority to collect solid waste, but not in Clallam or Jefferson Counties. MJ Trucking and DAT do not have WUTC authority to operate as solid waste collection companies.

*Murrey's WUTC Complaint*

In July 2020, Murrey's filed two different complaints with the WUTC asking for an order directing WMW, WMDSO, MJ Trucking, and DAT to cease and desist from engaging in the collection and transportation of solid waste from McKinley Paper and Port Townsend Paper. The WUTC consolidated these complaints.

Murrey's and Waste Management filed cross-motions seeking summary determination. The dispositive issue was whether federal law preempted WUTC regulation of Waste Management's solid waste collection activities. The WUTC concluded that federal preemption did not apply. As a result, the WUTC granted Murrey's motion for summary determination and denied Waste Management's motion. The WUTC then ordered Waste Management to cease and

4

No. 56291-0-II

desist from providing solid waste collection services to McKinley Paper and Port Townsend Paper.

Waste Management petitioned for judicial review, and the superior court transferred the matter to this court.

Waste Management subsequently filed a petition for a declaratory order with the STB, seeking a determination that federal law preempted the WUTC's order. The STB denied review because of this court's concurrent jurisdiction to answer the preemption question. *Waste Mgmt. of Wash., Inc.*, & *Waste Mgmt. Disposal Servs. of Or.*, Inc. – *Petition for Declaratory Order*, 2022 WL 331234 (U.S. Surface Transp. Bd. Feb. 2, 2022).

ANALYSIS

A. STANDARD OF REVIEW

The Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of agency decisions. RCW 34.05.510; *Puget Soundkeeper All. v. Dep't of Ecology*, 191 Wn.2d 631, 637, 424 P.3d 1173 (2018). Under the APA, we may grant relief from an agency's order based on one of nine reasons listed in RCW 34.05.570(3), including that the order is based on an erroneous interpretation or application of the law. RCW 34.05.570(3)(d). The party challenging the agency's decision has the burden of demonstrating the invalidity of that decision. RCW 34.05.570(1)(a).

If an administrative decision is based on summary judgment, we overlay the APA and summary judgment standards of review. *Haines-Marchel v. Wash. State Liquor & Cannabis Bd.*, 1 Wn. App. 2d 712, 728, 406 P.3d 1199 (2017). We review an agency's summary judgment ruling de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Hamilton v. Pollution Control Hr'gs Bd.*, 5 Wn. App. 2d 271, 281, 426 P.3d

5

No. 56291-0-II

281 (2018). Summary judgment on an issue is warranted only if there are no genuine issues of material fact. *Id.*

We review an agency's legal conclusions de novo. *Pac. Coast Shredding, LLC v. Port of Vancouver, USA*, 14 Wn. App. 2d 484, 502, 471 P.3d 934 (2020). We give "substantial weight to its interpretations of the law when subjects fall within its area of expertise." *Id.* However, "[w]hile we give agencies great deference to their interpretation of rules within their area of expertise, we may substitute our interpretation of the law for that of an agency." *Quinault Indian Nation v. Imperium Terminal Servs., LLC*, 187 Wn.2d 460, 474, 387 P.3d 670 (2017).

B.    WASHINGTON LAW REGARDING SOLID WASTE COLLECTION

RCW 81.77.020 states, "No person . . . shall engage in the business of operating as a solid waste collection company in this state, except in accordance with the provisions of this chapter." "Solid waste collection company" is defined as "every person . . . owning, controlling, operating, or managing vehicles used in the business of transporting solid waste for collection or disposal, or both, for compensation, . . . over any public highway in this state." RCW 81.77.010(9).

The WUTC regulates solid waste collection companies in Washington. RCW 81.77.030. RCW 81.77.040 states,

> A solid waste collection company shall not operate for the hauling of solid waste for compensation without first having obtained from the [WUTC] a certificate declaring that public convenience and necessity require such operation. Operating for the hauling of solid waste for compensation includes advertising, soliciting, offering, or entering into an agreement to provide that service.

Here, it is undisputed that WMDSO, WMW, MJ Trucking, and DAT had no authority from the WUTC to collect solid waste in Clallam or Jefferson Counties. Therefore, these entities violated

6

No. 56291-0-II

RCW 81.77.040 by collecting solid waste from McKinley Paper and Port Townsend Paper and transporting that waste on public highways.

C.      FEDERAL LAW REGARDING RAILROAD TRANSPORTATION

    1.    ICC and STB

In 1887, Congress enacted the Interstate Commerce Act, which created and authorized the ICC to establish rates that railroads could charge.  Pub. L. No. 49-104, 24 Stat. 379 (1887). In 1935, Congress in the Motor Carrier Act gave the ICC jurisdiction over the economic regulation of interstate motor carriages.  Pub. L. No. 74-255, 49 Stat. 543 (1935).

In 1995, Congress enacted the Interstate Commerce Commission Termination Act (ICCTA), which replaced the ICC with the STB.  Pub. L. 104-88, 109 Stat. 803 (1995). Although the ICC was dissolved, the ICC's "orders, determinations, rules, [and] regulations" remained valid and in force until "modified, terminated, superseded, set aside, or revoked" by the STB.  ICCTA § 204(a), 109 Stat. at 941.

    2.    Applicable Statutes and Regulations

49 U.S.C § 10101(1) states several federal policies regarding regulation in the railroad industry, including

> (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
> (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required.

This provision was enacted in the Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895, which had the purpose of revitalizing the railroad industry by reducing regulatory burdens.  *Coal Exporters Ass'n of U.S., Inc. v. United States*, 745 F.2d 76, 80-81 (D.C. Cir. 1984).

7

No. 56291-0-II

### a. Exclusive STB Jurisdiction and Preemption

Under 49 U.S.C. § 10501(a)(1)(A), the STB "has jurisdiction over transportation by rail carrier that is . . . only by railroad."  49 U.S.C. § 10501(b) further provides:

The jurisdiction of the Board over--

(1) *transportation by rail carriers*, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers;

. . . .

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and *preempt the remedies provided under Federal or State law*.

(Emphasis added.)

### b. Exemption from Federal Regulation

49 U.S.C. § 10502(a) authorizes the STB to exempt from federal regulation certain rail transportation:

In a matter *related to a rail carrier providing transportation* subject to the jurisdiction of the [STB] under this part, the [STB], to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the [STB] finds that the application in whole or in part of a provision of this part—

(1) is not necessary to carry out the transportation policy of section 10101 of this title; and

(2) either --
  (A) the transaction or service is of limited scope; or
  (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

(Emphasis added.)  49 U.S.C. § 10502(f) states, "The Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement."

8

No. 56291-0-II

Pursuant to this authority, the ICC in the 1980s adopted through rulemaking a number of exemptions regarding the motor carrier portions of TOFC/COFC service. First, the ICC provided an exemption when a railroad owned the trucks. *Improvement of TOFC/COFC Regulation*, 364 I.C.C. 731 (1981) (Sub-No. 5). Next, the ICC expanded the exemption to include motor carriers acting as an agent or joint partner of a railroad. *Improvement of TOFC/COFC Regulation (R.R. - Affiliated Motor Carriers & Other Motor Carriers)*, 3 I.C.C.2d 869 (1987) (Sub-No. 6). Finally, the ICC exempted TOFC/COFC service arranged independently by the shipper and performed immediately before or after TOFC/COFC movement by a rail carrier. *Improvement of TOFC/COFC Regulation (Pickup & Delivery)*, 6 I.C.C.2d 208 (1989).

The current regulation is 49 C.F.R. § 1090.2, in which the STB has exempted TOFC/COFC service from certain federal requirements:

> Except as provided in 49 U.S.C. 10502(e) and (g) and 13902, *rail TOFC/COFC service and highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement is exempt* from the requirements of 49 U.S.C. subtitle IV, *regardless of the type, affiliation, or ownership of the carrier performing the highway portion of the service*. Motor carrier TOFC/COFC pickup and delivery services arranged independently with the shipper or receiver (or its representative/agent) and performed immediately before or after a TOFC/COFC movement provided by a rail carrier are similarly exempt.

(Emphasis added.) However, § 1090.2 expressly states, "The exemption does not apply to a motor carrier service in which a rail carrier participates only as the motor carrier's agent (Plan I TOFC/COFC)."

49 CFR § 1090.1(b) defines highway TOFC/COFC service:

> (b) *Highway TOFC/COFC service* means the highway transportation, in interstate or foreign commerce, of any of the types of equipment listed in paragraph (a) of this section *as part of a continuous intermodal movement that includes rail TOFC/COFC service, and during which the trailer or container is not unloaded*.

9

No. 56291-0-II

(Emphasis added.)

Nothing in 49 U.S.C. § 10502(a) or (b) expressly preempts or even mentions state law. The regulation establishes exemptions from certain federal laws.

        c.    Motor Carrier Jurisdiction and Preemption

The STB also has jurisdiction under 49 U.S.C. § 13501 "over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both are transported by motor carrier" in interstate commerce. "Motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

In the Federal Aviation Administration Authorization Act of 1994, Congress enacted a preemption provision regarding certain intrastate transportation of property by motor carriers:

> Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder *with respect to the transportation of property*.

49 U.S.C. § 14501(c)(1) (emphasis added).

D.      PREEMPTION OF WASHINGTON LAW

Waste Management argues that 49 U.S.C. § 10501(b) and 49 C.F.R. § 1090.2 operate to preempt Washington law regarding their solid waste collection activities because the waste was collected in cargo containers that were transported in part on rail cars. We disagree.

    1.    Preemption Principles

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Congress can expressly or implicitly preempt state law through federal legislation. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S. Ct. 1591,

10

No. 56291-0-II

191 L. Ed. 2d. 511 (2015). In addressing the preemptive effect of a statute, the guiding principle is that the purpose of Congress controls. *Altria Group, Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008). Where Congress expressly preempts state law, the plain text of the statute "begins and ends [the] analysis." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125, 136 S. Ct. 1938, 195 L. Ed. 2d 298 (2016). However, even for an express preemption clause the court must determine "the substance and scope of Congress' displacement of state law." *Altria Group*, 555 U.S. at 76.

Our preemption analysis starts " 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* at 77 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947)); *see also NW Wholesale, Inc. v. Pac Organic Fruit, LLC*, 184 Wn.2d 176, 184, 357 P.3d 650 (2015) (quoting similar passage). The assumption especially applies "when Congress has legislated in a field traditionally occupied by the States." *Altria Group*, 555 U.S. at 77. Therefore, courts generally apply a reading of a preemption statute that disfavors preemption when the text of the statute is susceptible to more than one plausible reading. *Id.*

Waste Management argues that there is no presumption against preemption here because the federal government traditionally has regulated rail transportation. However, the question is whether the federal statute preempts state regulation of solid waste collection. Congress has recognized that "the collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies." 42 U.S.C. § 6901 (a)(4).

In addition, our Supreme Court repeatedly has emphasized that "there is a strong general presumption against finding that federal law has preempted state law." *Estate of Becker v. Avco*

11

No. 56291-0-II

*Corp.*, 187 Wn.2d 615, 622, 387 P.3d 1066 (2017). Division One of this court has applied this presumption against preemption in the context of 49 U.S.C § 10501(b). *City of Seattle v. Ballard Terminal R.R. Co.*, 22 Wn. App. 2d 61, 71, 509 P.3d 844, *review denied,* 200 Wn.2d 1008 (2022).

    2.    Express Preemption – 49 U.S.C. § 10501(b)

Waste Management argues that 49 U.S.C. § 10501(b) expressly preempts state law regarding the collection of solid waste in closed containers as part of TOFC/COFC service. We disagree.

49 U.S.C. § 10501(b) states that the STB has exclusive jurisdiction over "transportation by rail carriers" and that the remedies provided regarding the regulation of "rail transportation" preempt state law. There is no question that this statute expressly provides for preemption of state law under certain circumstances. *See City of Seattle v. Burlington N. R.R. Co.*, 145 Wn.2d 661, 668, 41 P.3d 1169 (2002); *see also City of Auburn v. United States Gov't*, 154 F.3d 1025, 1030-31 (9th Cir. 1998).

However, the plain language of 49 U.S.C. § 10501(b) limits the scope of preemption to matters involving "transportation by rail carriers." For an activity to come within the STB's exclusive jurisdiction and to be covered by preemption, the activity must satisfy both the "transportation" and "rail carrier" requirements. *E.g., Del Grosso v. Surface Transp. Bd.*, 804 F.3d 110, 114 (1st Cir. 2015); *N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 72 (2d Cir. 2011); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 247-51 (3d Cir. 2007).

We need not decide whether Waste Management's solid waste collection services qualify as "transportation" under 49 U.S.C. § 10501(b) because we conclude that Waste Management cannot satisfy the "by rail carrier" requirement.

12

No. 56291-0-II

49 U.S.C. § 10102(5) defines "rail carrier" to mean "a person providing common carrier railroad transportation for compensation." It is undisputed that none of the Waste Management entities are rail carriers. On the other hand, Union Pacific – which transports the solid waste to the Columbia Ridge landfill on the last leg of the TOFC/COFC service – is a rail carrier. The question here is whether the Waste Management entities can satisfy the rail carrier requirement because they ultimately deliver the solid waste they collect to a rail carrier.

In *Hi Tech Trans, LLC– Petition for Declaratory Order – Newark, NJ*, 2003 WL 21952136 (U.S. Surface Transp. Bd. Aug. 14, 2003) (*Hi Tech Trans* I), the STB addressed whether operations by a company that is not a rail carrier can satisfy the rail carrier requirement in 49 U.S.C. § 10501(b). Hi Tech contracted for trucks to transport construction and demolition (C&D) debris to a transloading facility at a Canadian Pacific Railway (CP) rail yard, where the debris was loaded onto rail cars. *Id.* at *1. Hi Tech then directed CP where to transport the debris. *Id.* CP had no responsibility or liability for Hi Tech's operations, and was responsible only for transporting the loaded rail cars. *Id.* at *1-2.

The STB summarized Hi Tech's position as follows:

Hi Tech does not argue that it is a rail carrier. Instead, it contends that the test to determine whether its facility is considered transportation by rail carrier is whether it is integrally related to interstate rail service. Hi Tech argues that its facility is integrally related to CP's interstate rail service because its transloading activities benefit CP and because C&D debris cannot be transported by rail without first being loaded into rail cars. Essentially, Hi Tech maintains that there is no legal distinction between a transloading facility operated by a noncarrier licensee and one operated by a rail carrier.

*Id.* at *4.

The STB rejected this argument:

By Hi Tech's reasoning, any third party or noncarrier that even remotely supports or uses rail carriers would come within the statutory meaning of transportation by rail carrier. The [STB] and its predecessor, the Interstate Commerce Commission,

13

No. 56291-0-II

> have indicated that the jurisdiction of this agency may extend to certain activities and facets of rail transloading facilities, but that any such activities or facilities must be closely related to providing direct rail service. In every case, jurisdiction was found and local regulations relating to transportation facilities preempted only when those facilities have been operated or controlled by a rail carrier. Here, Hi Tech's activities are not performed by a rail carrier.
>
> *The facts of this case establish that Hi Tech's relationship with CP is that of a shipper with a carrier.* Hi Tech brings cargo and loads it onto rail cars, and CP, under the Transportation Agreement, hauls it to a destination designated by Hi Tech. . . . Moreover, CP disclaims any agency or employment relationship with Hi Tech and, under the License Agreement, the parties all but eliminate CP's involvement in the operation of the transloading facility and its responsibility for it. There is no evidence that CP quotes rates or charges compensation for use of Hi Tech's transloading facility. Thus, CP's level of involvement with Hi Tech's transloading operation at its Oak Island Yard is minimal and insufficient to make Hi Tech's activities an integral part of CP's provision of transportation by rail carrier.

*Id.* The STB concluded that "Hi Tech's activities at its transloading facility at CP's Oak Island Yard and related activities are not part of 'transportation by rail carrier' as defined under 49 U.S.C. 10501(a). Hi Tech is merely using CP's property to transload cargo." *Id.* at *5.

The Third Circuit addressed the same issue in *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 299 (3d Cir. 2004) (*Hi Tech Trans* II). The court provided more detail regarding Hi Tech's operations: trucks hauled waste to the facility and discharged the waste into a hopper, and the waste then was loaded from the hopper onto rail cars. *Id.* at 299. Hi Tech argued that 49 U.S.C. § 10501(b) preempted state permit and license requirements for solid waste disposal facilities. *Id.* at 308.

The court held that even assuming that Hi Tech's facility involved "transportation," the facility did not involve transportation by a "rail carrier." *Id.* The court emphasized that CP, not Hi Tech, transported the waste by rail. The court stated that "[t]he most [Hi Tech's facility] involves is transportation '*to* rail carrier.' " *Id.* The court found it significant that CP had no

14

No. 56291-0-II

involvement in or responsibility for Hi Tech's operations, and that there was no agency relationship between Hi Tech and CP. *Id.*

The court concluded:

> [I]t is clear that Hi Tech simply uses [CP']s property to load C & D debris into/onto [CP's] railcars. *The mere fact that the [CP] ultimately uses rail cars to transport the C & D debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier."* Indeed, if Hi Tech's reasoning is accepted, any nonrail carrier's operations would come under the exclusive jurisdiction of the STB if, at some point in a chain of distribution, it handles products that are eventually shipped by rail by a railcarrier. The district court could not accept the argument that Congress intended the exclusive jurisdiction of the STB to sweep that broadly, and neither can we.

*Id.* at 309 (emphasis added).

Waste Management attempts to distinguish *Hi Tech Trans* I and II because those cases did not involve TOFC/COFC service in which closed containers were transferred from truck to rail car. Instead, Hi Tech processed waste outside of the original cargo containers. Waste Management essentially argues that transportation by rail carrier includes motor carriers performing any portion of TOFC/COFC service that culminates in transport by rail. However, Waste Management cites no STB or case authority for this proposition, and the only cases Waste Management cites involved operations conducted by actual rail carriers. *See N.Y. Susquehanna*, 500 F.3d at 249-50; *New England Transrail, LLC, d/b/a Wilmington & Woburn Terminal Ry. -- Construction, Acquisition & Operation Exemption -- in Wilmington & Woburn, MA*, Fed. Carr. Cas. (CCH) ¶ 37,241, 2007 WL 1989841 (U.S. Surface Transp. Bd. July 10, 2007).

*Hi Tech Trans* I and II indicate that Waste Management's activities do not constitute transportation by a rail carrier. As in those cases, the only relationship between Waste Management and Union Pacific was shipper to carrier. There is no evidence that Union Pacific had any involvement in or responsibility for Waste Management's solid waste collection

15

No. 56291-0-II

activities, and Union Pacific merely transported the solid waste to the location that Waste Management designated. As the court noted in *Hi Tech Trans* II, Waste Management's solid waste collection activities involved transportation *to* a rail carrier, not *by* a rail carrier. *See* 382 F.3d at 308.

We conclude that Waste Management's solid waste collection activities did not constitute transportation "by rail carrier" under 49 U.S.C. § 10501(b). Therefore, we hold that 49 U.S.C. § 10501(b) does not preempt chapter 81.77 RCW with regard to those activities.[2]

3.    STB Exemptions – 49 C.F.R. § 1090.2

Waste Management argues that the STB's exemption of the motor carrier leg of TOFC/COFC service from federal regulation in 49 C.F.R. § 1090.2, as authorized in 49 U.S.C. § 10502(a), demonstrates that the STB has exercised jurisdiction over those services and therefore that preemption applies. We disagree.

As noted above, 49 C.F.R. § 1090.2 exempts from federal regulation (1) "rail TOFC/COFC service and highway TOFC/COFC service provided by a rail carrier either itself or jointly with a motor carrier as part of a continuous intermodal freight movement . . . regardless of the type, affiliation, or ownership of the carrier performing the highway portion of the service," and (2) "pickup and delivery services arranged independently with the shipper or receiver (or its representative/agent) and performed immediately before or after a TOFC/COFC movement." Waste Management emphasizes that the exercise of this exemption authority presupposes STB jurisdiction over the services exempted. *See Cent. States Motor Freight Bureau, Inc. v. Interstate Com. Comm'n*, 924 F.2d 1099, 1102 (D.C. Cir. 1991).

---

[2] The WUTC argues that 49 U.S.C. § 10501(b) does not apply at all to motor carriers, even when providing TOFC/COFC service. Because we hold that 49 U.S.C. § 10501(b) preemption does not apply here, we do not address this argument.

16

No. 56291-0-II

However, 49 C.F.R. § 1090.2 contains no preemption provision. That provision only exempts certain TOFC/COFC service from *federal* regulation. Waste Management argues that the STB's exercise of jurisdiction over TOFC/COFC service implicates the exclusive jurisdiction and preemption provisions of 49 U.S.C. § 10501(b). But we concluded above that Waste Management's activities do not constitute transportation by rail carrier, and therefore the 49 U.S.C. § 10501(b) preemption provision does not apply to state regulation of those activities. So even if the STB exercises jurisdiction over the motor vehicle portion of TOFC/COFC service, that jurisdiction is not exclusive under 49 U.S.C. § 10501(b). And if 49 U.S.C. § 10501(b) does not apply, there is no basis for applying preemption under 49 C.F.R. § 1090.2.

Further, Waste Management cites to no STB or case authority specifically holding that the exercise of jurisdiction over the motor vehicle portion of TOFC/COFC service under 49 C.F.R. § 1090.2 operates to preempt state regulation of that service.

We conclude that 49 C.F.R. § 1090.2 does not preempt state regulation of Waste Management's solid waste collection activities.[3]

4.    Incidental Impact on Rail Transportation

In further support of our conclusion that neither 49 U.S.C. § 10501(b) nor 49 C.F.R. § 1090.2 preempt Washington law regarding the regulation of solid waste collection, we conclude that Congress did not intend to preempt state laws like those in chapter 81.77 RCW that only incidentally affect rail transportation.

---

[3] The WUTC argues that the provision in 49 C.F.R. § 1090.2 that exempts the motor carrier portion of TOFC/COFC service was based on the STB's authority to regulate motor carrier transportation, not its authority to regulate rail transportation. Because we hold that 49 C.F.R. § 1090.2 does not preempt state regulation here, we do not address this argument.

No. 56291-0-II

49 U.S.C. § 10501(b) preempts state law remedies "with respect to *regulation* of rail transportation." (Emphasis added.) Inclusion of the word "regulation" necessarily conveys a different meaning than would the broader phrase "with respect to rail transportation." *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001). Therefore, 49 U.S.C. § 10501(b) can be interpreted as preempting "state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, *while permitting the continued application of laws having a more remote or incidental effect on rail transportation.*" *Id.* (emphasis added) (alterations in original) (quoting BLACK'S LAW DICTIONARY 1286 (6th ed. 1990)). Division One quoted this language in *Ballard Terminal Railroad*, 22 Wn. App. 2d at 71. "What matters is the degree to which the challenged regulation burdens rails transportation." *N.Y. Susquehanna*, 500 F.3d at 252.

Multiple federal circuit courts have held that the ICCTA is narrowly tailored to only preempt state law that has a managing or governing effect on rail transportation, not an incidental or remote one. *Ass'n. of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097-98 (9th Cir. 2010); *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 410 (5th Cir. 2010); *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009); *Adrian & Blissfield R.R. Co. v. Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008); *N.Y. Susquehanna*, 500 F.3d at 252; *see also Girard v. Youngstown Belt Ry. Co.*, 979 N.E. 2d. 1273, 1281 (Ohio 2012). "Generally speaking, ICCTA does not preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce." *Ass'n of Am. R.R.*, 622 F.3d at 1097.

The legislative history of the ICCTA noted that although federal regulation was intended to be exclusive, "States retain the police powers reserved by the Constitution." H.R. REP. NO. 104-311, at 96 (1995). Similarly, the Conference Report for 49 U.S.C. § 10501(b) stated that the

18

No. 56291-0-II

exclusivity of federal remedies stated in that section was "limited to remedies with respect to rail regulation – not State and Federal law generally." H.R. REP. NO. 104-422, at 167 (1995) (Conf. Rep.).

Here, chapter 81.77 RCW does not have a managing effect on rail transportation. The applicable statutes address only solid waste collection companies, which are persons who use vehicles to transport solid waste for collection or disposal over any public highway. RCW 81.77.010(9). The WUTC's authorization is required regardless of whether the solid waste eventually is delivered to a rail carrier. RCW 81.77.040 does not attempt to regulate rail transportation or to limit rail carriers' handling of solid waste. Instead, that statute regulates only the motor carriers who can collect and transport solid waste and who may bring solid waste to rail carriers. As a result, any effect on rail transportation is indirect, remote, and incidental.

In addition, the regulation of solid waste collection involves public health and safety that constitutes a valid exercise of police power. *See Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 40, 873 P.2d 478 (1994). As our Supreme Court has stated, " '[o]ne could hardly imagine an area of regulation that has been considered to be more intrinsically local in nature than collection of garbage and refuse, upon which may rest the health, safety, and aesthetic well-being of the community.' " *Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 109, 178 P.3d 960 (2008) (quoting *AGG Enter. v. Wash. County*, 281 F.3d 1324, 1328 (9th Cir. 2002)). There is no indication in the statutory language or in the case law that Congress intended to preempt these traditionally local, police power regulations.

We conclude that Congress did not intend to preempt state government regulation of the collection of solid waste, which has only a remote and incidental effect on rail transportation.

19

No. 56291-0-II

5.    Summary

We conclude that neither 49 U.S.C. § 10501(b) nor 49 C.F.R. § 1090.2 operate to preempt Washington law regarding solid waste collection activities, and that Congress did not intend to preempt state government regulation of the collection of solid waste.  Therefore, Waste Management cannot show that the UTC's summary determination order was based on an erroneous interpretation or application of the law under RCW 34.05.570(3)(d).

CONCLUSION

We affirm the WUTC's summary determination order.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
GLASGOW, C.J.

20